678 F.2d 1150
 KUNSTSAMMLUNGEN ZU WEIMAR, Plaintiff-Intervenor-Appellee,
and
Elisabeth Mathilde Isidore Erbgrossherzogin Von
Sachsen-Weimar-Eisenach (Grand Duchess of
Saxony-Weimar), Plaintiff-Intervenor-Appellant,
and
Federal Republic of Germany, Original Plaintiff,
v.
Edward I. ELICOFON, Defendant-Appellant.
 Nos. 446, 535, Dockets 81-7542, 81-7544.
 United States Court of Appeals,
Second Circuit.
 Argued March 25, 1982.
Decided May 5, 1982.
 
 Richard W. Hulbert, New York City (David G. Sabel, Jonathan I. Blackman, Cleary, Gottlieb, Steen & Hamilton, New York City, of counsel), for defendant-appellant.
 Harry I. Rand, New York City (Lawrence M. Kaye, James A. Altman, Botein, Hays, Sklar & Herzberg, New York City, of counsel), for plaintiff-intervenor-appellee Kunstsammlungen zu Weimar.
 Benjamin B. Ferencz, New York City (Kenneth Simon, Taylor, Ferencz & Simon, New York City, of counsel), for plaintiff-intervenor-appellant Grand Duchess of Saxony-Weimar.
 Before FEINBERG, Chief Judge, and MANSFIELD and OAKES, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 In this diversity suit involving two foreign countries (East Germany and West Germany), a foreign national, and an American citizen, we are asked to determine the ownership of two priceless Albrecht Duerer portraits executed around 1499.[1] They were stolen in 1945 from a castle located in what is now East Germany and fortuitously discovered in 1966 in the Brooklyn home of Edward I. Elicofon, an American citizen, where they had been openly displayed by him to friends since his good-faith purchase of them over 20 years earlier without knowledge that they were Duerers. The search for an answer to the deceptively simple question, "Who owns the paintings?," involves a labyrinthian journey through 19th century German dynastic law, contemporary German property law, Allied Military Law during the post-War occupation of Germany, New York State law, and intricate conceptions of succession and sovereignty in international law.
 
 
 2
 The Grand Duchess of Saxony-Weimar ("Grand Duchess"), who intervened as plaintiff in the lawsuit, which was initiated in 1969 by the Federal Republic of Germany ("FRG"), the government of West Germany, claims that the paintings were and remain the private property of the successive Grand Dukes of Saxony-Weimar and that title to the paintings was assigned to her by her husband Grand Duke Carl August. Kunstsammlungen zu Weimar ("KZW"), or the Weimar Art Collection, also intervened as plaintiff representing the interests of the German Democratic Republic ("GDR"), the government of East Germany, claiming that title to the paintings passed to the GDR as a successor in interest to the public property of predecessor sovereignties. Elicofon claims title based on his good faith purchase and uninterrupted possession of the paintings for 20 years.
 
 
 3
 In separate opinions, Judge Jacob Mishler of the Eastern District of New York granted summary judgment in favor of KZW and dismissed the claims of both intervenor-plaintiff Grand Duchess and defendant Elicofon. We affirm, substantially for the reasons stated in Judge Mishler's thorough and carefully reasoned opinions. See 536 F.Supp. 813 (E.D.N.Y.1978) and 536 F.Supp. 829 (E.D.N.Y.1981).
 
 
 4
 This consolidated appeal raises two distinct issues: (1) as between the Grand Duchess and KZW, who owned the Duerer paintings when they were stolen in 1945; and (2) whether Elicofon subsequently acquired valid title at the expense of the true owner, either upon his purchase or at some later time as a result of his uninterrupted good faith possession of them for 20 years from 1946 to 1966. In summarizing the facts we are guided by the principles that summary judgment is appropriate only where there is no genuine issue as to any material fact and that the inferences to be drawn "must be viewed in the light most favorable to the part(ies) opposing the motion." United States v. Diebold, 369 U.S. 654, 655, 82 S.ct. 993, 994, 8 L.Ed.2d 176 (1962).
 
 
 5
 The two Duerer paintings had been in the possession of successive Grand Dukes of Saxony Weimar since at least Goethe's time in 1824. They were part of what was known as the Grossherzogliche Kunstsammlung, or the "Grand Ducal Art Collection." By 1913 the paintings along with other art objects were displayed in the Grand Ducal Museum in Weimar. Notwithstanding the failure of the 1913 Museum catalogue to designate the Duerer paintings as privately owned by the then Grand Duke (Wilhelm Ernst), the Grand Duchess maintains that they were his personal property and continued to be the personal property of his successors. KZW contends, to the contrary, that the paintings were public property on the basis of 19th century dynastic law, a 1921 settlement between the Grand Duke Wilhelm Ernst and the newly established Territory of Weimar (the successor sovereign of the Grand Duchy), and a 1927 settlement with the Land of Thuringia, successor to the Territory of Weimar.
 
 
 6
 Under German dynastic law in the nineteenth and early twentieth century property held by royal heads of state (e.g., grand dukes, princes, etc.) in their capacities as sovereigns was distinguished from property held in their private capacities. Personally-owned property could be disposed of freely, while property held as sovereign could be disposed of only with the express authorization of the Landtag (i.e., the Diet or Parliament) and normally passed upon the death of a grand duke to his eldest son as successor sovereign. KZW contends that the Grand Ducal Art Collection, which included the two Duerer paintings, constituted "Krongut" (roughly, "crown goods"), held by the Grand Duke of Saxony Weimar as sovereign only and not in his personal capacity as private property. Therefore, it urges, when Grand Duke Wilhelm Ernst abdicated his sovereignty in November 1918 upon Germany's defeat, any rights he formerly exercised as sovereign regarding the Grand Ducal Art Collection automatically passed to the Territory of Weimar.[2]
 
 
 7
 The Grand Duchess responds that in 1848 the Grand Ducal Art Collection was declared to be a "Kronfideikomiss" (roughly, "family trust"), in which title was vested in the Grand Ducal family until the male line became extinct, thereby removing the Collection from the domain of property held as sovereign. However, according to KZW's German law expert, the terms "Krongut" and "Kronfideikomiss" were used interchangeably and both were subsumed under the broader classification "Kammervermoegen" (or property of the chamber), which denotes the aggregate of the property held by the sovereign in his official capacity. Under this view, title to the Duerer paintings passed to the Territory of Weimar automatically in 1918.
 
 
 8
 Subsequent to his abdication the Grand Duke Wilhelm Ernst in 1921 entered into an "Auseinandersetzungsvertrag" or settlement agreement ("1921 Agreement") with the Territory of Weimar, which defined their respective rights and obligations with respect to property held as "Kammervermoegen" and that held by him privately. Section 1 of that Agreement provided:
 
 
 9
 "The former sovereign, Grand Duke Wilhelm Ernst of Saxony, having, on November 9, 1918, for himself and his family, renounced the throne and succession to the throne in Saxe-Weimar-Eisenach for all time, the Grand Duke acknowledges a simultaneous renunciation of the payment of the civil list for the period on and after January 1, 1919 and that the entire Kammervermoegen, inclusive of the Krongut, is the exclusive property of the Territory of Weimar or its legal successor, insofar as not otherwise hereinafter expressly provided." (Citation omitted).
 
 
 10
 With respect to artwork privately owned by the Grand Duke, § 8 provided that he
 
 
 11
 "shall continue, as heretofore, to permit the public view of the objects d'art belonging to him and his family that are presently situated in public institutions and museums...."
 
 
 12
 Under § 9 these privately-owned art objects would become the property of the Territory of Weimar upon the extinction of his male line. Other sections provided for the surrender and reservation of certain rights and privileges. Section 17 provided for a lump sum payment and annuities to descendants.[3]
 
 
 13
 Subsequent to the 1921 Agreement it became apparent that the Grand Duke had surrendered physical possession of only a part of the former Grand Ducal Art Collection,[4] including the Duerer paintings, but had improperly retained a portion, some of which had been destroyed or lost. The Land of Thuringia, which had succeeded to the Territory of Weimar,[5] therefore commenced an arbitration proceeding pursuant to § 34 of the 1921 Agreement against the heirs of Grand Duke Wilhelm Ernest (who had died in 1923 or 1924) seeking the withheld portion. After lengthy negotiations in which the Grand Duke's widow, acting on her own behalf and for her minor children, maintained that the former Ducal Art Collection had always been and still was the Grand Duke's private property, the parties reached a settlement in 1927 ("1927 Agreement"). Section 1 of that Agreement provided:
 
 
 14
 "The arbitration defendants (Grand Duke's widow and heirs) acknowledge the property of the Land of Thuringia in the so-called Grand Ducal Art Collection. They surrender (give up) this collection, insofar as it is not already in the direct possession of the Land of Thuringia, and insofar as exceptions are not herein provided, to the Land."
 
 
 15
 An exchange of correspondence between the parties clearly reveals that the phrase "so-called Grand Ducal Art Collection" was meant to encompass both those paintings previously surrendered, including the Duerers, and those that had been improperly retained.
 
 
 16
 The annuities under the 1921 Agreement were paid to the Grand Duke's heirs until 1945, when payments ceased. In 1948 the right to the annuities was extinguished by expropriation through an Act passed by the Landtag of Thuringia.
 
 
 17
 KZW maintains that the Duerer paintings became public property in any of three ways: (1) the 1918 abdication of Wilhelm Ernst, (2) the 1921 Agreement, and (3) the 1927 Agreement, and that KZW acquired title as the successor to the Land of Thuringia.[6] The Grand Duchess maintains, apparently in the alternative, either that the paintings were private property whose title never passed to the Land because male heirs remain extant even today, or that, although title may have passed, she regained it when the annuities were improperly terminated in 1945.[7] She thus demands either the return of the paintings or the payment by the GDR of past due and future annuities.
 
 
 18
 Elicofon's claim of ownership arises out of his uninterrupted possession of the Duerer paintings from the time of his good-faith purchase of them in 1946 from an American serviceman in Brooklyn to his discovery in 1966 of the identity of the paintings. Until 1943 the Duerer paintings had remained on exhibit in a museum in Weimar, Thuringia, known as the Staatliche Kunstsammlungen zu Weimar, the predecessor to the intervenor-plaintiff KZW. To protect the exhibited artworks from anticipated bombardment, they were in 1943 stored in a nearby castle, the Schloss-Schwarzburg, located in the District of Rudolstadt in the Land of Thuringia. They remained there until stolen some time between June 12 and July 19, 1945. Their disappearance coincided with the withdrawal of the temporary American occupation forces which were replaced by the Russian Army on July 2, 1945.[8] Dr. Scheidig, the Director of the Weimar Museum from 1940 to 1967, who discovered the theft on an inspection of the castle, immediately reported the theft and thereafter engaged in diligent efforts to locate the paintings. These efforts included contacting various German museums and administrative organs, the Allied Control Council, the Soviet Military Administration, the United States State Department, and the Fogg and Germanic museums at Harvard (which were active in locating stolen art), all to no avail.
 
 
 19
 In the meantime, unbeknownst to Dr. Scheidig or the art world generally, Elicofon purchased the unsigned Duerer paintings in the spring of 1946 for $450 from a young American ex-serviceman who appeared at his Brooklyn home and claimed to have purchased the paintings in Germany. Elicofon framed and displayed them on the wall in his home along with his many other collected art objects.[9] In the years that followed his house was used for numerous charity functions and other large gatherings and his collection was viewed by many people, including some who were knowledgeable about art.
 
 
 20
 In May of 1966 Elicofon discovered the identity of the Duerer paintings through a friend who had recently seen them listed in a German book describing stolen art treasures of W.W. II. His discovery was publicized in a front-page article in The New York Times of May 30, 1966, and was described by one official of the Metropolitan Museum as the "discovery of the century." Thereafter the FRG, the Grand Duchess and KZW all demanded the return of the paintings; KZW's demand was made in September 1966. These demands were refused.
 
 
 21
 In January 1969 the FRG commenced this litigation, seeking "custody of the possession of the Duerer paintings in order ultimately to restore them to the person or party who is truly and rightfully entitled to their possession." The United States submitted a "Suggestion of Interest," noting that the GDR was barred from suing since it was still not recognized by the United States, and stating that it recognized the FRG as "entitled in this litigation to represent the Weimar Museum as trustee of its interests."
 
 
 22
 In March 1969 the Grand Duchess sought and was granted leave to intervene as a plaintiff. In April 1969 KZW also moved to intervene but was denied permission to do so on the ground that it was "an arm and agency" of the then unrecognized GDR government and therefore barred from suing in our courts. Federal Republic of Germany v. Elicofon, 358 F.Supp. 747 (E.D.N.Y.1972), aff'd, 478 F.2d 231 (2d Cir. 1973), cert. denied, 415 U.S. 931, 94 S.Ct. 1443, 39 L.Ed.2d 489 (1974).
 
 
 23
 On September 4, 1974, the United States formally recognized the GDR government, and in February 1975 Judge Mishler vacated his earlier order and permitted KZW to intervene as plaintiff. As a result, the FRG in December 1975 was granted leave to withdraw and discontinue its claim with prejudice on the ground that "prior impediments to the ability of Kunstsammlungen zu Weimar to pursue this action" had been removed. Also as a result of KZW's entry, the Grand Duchess on April 9, 1975, filed an amended complaint adding certain cross-claims against KZW for the payment of past-due and future annuities allegedly owing under the 1921 Agreement.
 
 
 24
 By decision and order dated August 24, 1978, Judge Mishler granted KZW's motion for summary judgment dismissing the Grand Duchess' claim and denied her request for an order compelling additional discovery. On the central question of title, Judge Mishler held that the 1927 Agreement, standing alone, "unequivocably established that at least from that time forward" the paintings were owned by the State. He explicitly left unresolved KZW's claims that title passed automatically in 1918 upon the Grand Duke's abdication and by virtue of the 1921 Agreement. He based his view of the 1927 Agreement on (1) the terms of § 1 of that Agreement, (2) an exchange of correspondence demonstrating that the 1927 Agreement covered the Duerer paintings, and (3) a 1973 judgment by the highest court of the FRG regarding certain other paintings in the same posture as the Duerers, which rejected the Grand Duchess' claim that the Grand Ducal Art Collection was private property.[10] As to the Grand Duchess' claim for annuities, Judge Mishler held the claim barred by the Act of State doctrine, sovereign immunity principles, and by the provisions of 13(g) of the F.R.Civ.P.[11] governing ancillary jurisdiction over cross-claims.
 
 
 25
 In interpreting the 1927 Agreement, Judge Mishler apparently disregarded certain summaries of German documents submitted by the Grand Duchess' attorney in an affidavit, holding that Rule 56(e) of the F.R.Civ.P. required the documents themselves or copies thereof to be attached, which they were not. These documents, contained in two Thuringian Finance and Culture Ministry files that the Grand Duchess had belatedly obtained only through discovery, reveal the course of negotiation between the Weimar Museum and the Grand Duke's heirs in the three to four years leading up to the 1927 Agreement. Judge Mishler also denied the Grand Duchess' request, based in large part on these recently discovered documents, for an order compelling additional discovery and postponing decision on the summary judgment motion, holding that she had failed to disclose any issues of material fact to warrant further discovery under Rule 56(f) of the F.R.Civ.P.
 
 
 26
 On September 1, 1978, the Grand Duchess moved for reargument, this time attaching copies of the German documents summarized in the earlier affidavit. On September 5, 1978, Judge Mishler denied the motion, stating that it "presents no new facts ... nor raises any principles of law not considered by this court in its original disposition."
 
 
 27
 As a result of these dispositions, the only claims that remained to be adjudicated were those between Elicofon and KZW. By decision and order dated June 12, 1981, Judge Mishler denied Elicofon's motion for summary judgment dismissing the complaint and granted KZW's motion for summary judgment in its favor, thereby terminating the litigation. Judge Mishler found that the paintings were stolen between June 12 and July 19, 1945, that the GDR is entitled to assert ownership as a successor in interest to the property of either the Land of Thuringia or the Third Reich, and that KZW is a validly authorized juristic person with legal capacity to prosecute this claim on behalf of the GDR. On the central issue of title, Elicofon had claimed that he obtained good title at the time of his purchase since the paintings were initially sold by a custodian of the paintings who under German law could convey good title even though not himself in possession of good title.[12] In the alternative Elicofon claimed that he acquired good title some time subsequent to his purchase, either under the German doctrine of "Ersitzung," under which a good faith purchaser gains title to a stolen object upon 10 years' possession without notice of defect in title, or because the New York statute of limitations had run and therefore barred KZW from bringing this suit. Judge Mishler rejected both theories and held that KZW was entitled to the paintings as their lawful owner by succession.
 
 DISCUSSION
 The Grand Duchess' Claim
 
 28
 With respect to the summary judgment entered against the Grand Duchess, she contends that the district court failed to consider all relevant evidence by ignoring the document summaries and refusing to order additional discovery. She urges that Judge Mishler ruled incorrectly that the document summaries did not comply with the requirements of Rule 56(e). We need not reach this issue, since on the Grand Duchess' motion for reargument Judge Mishler had before him copies of the previously summarized documents and affirmed his earlier decision. Judge Mishler also properly denied the Grand Duchess' motion to order the production of additional documents and to postpone decision on the summary judgment motion. The primary basis of her request for additional discovery is that the documents contained in the two Thuringian Finance and Culture Ministry files were relevant to a proper understanding of the 1927 Agreement, and that KZW's deliberate withholding of these files until forced to turn them over creates an inference that it may still have in its possession additional relevant information.
 
 
 29
 Judge Mishler found, and we agree, that the Grand Duchess had had ample opportunity to conduct discovery to support her various claims and failed to "specify a single fact that (she has) reason to believe will emerge from the requested document production." The documents produced establish only that during the negotiations preceding the 1927 Agreement the Grand Duke persisted in asserting the private status of the Grand Ducal Art Collection, a self-serving position that can cast no doubt on the express terms of the 1927 (and 1921) Agreement in which the Grand Duke openly "acknowledge(s)" public title. Furthermore, aside from the Grand Duchess' bare allegations, there is no reason to doubt KZW's representation to Judge Mishler that it possessed no more information responsive to the Grand Duchess' requests. We conclude that the summary judgment decision was based on all relevant evidence.
 
 
 30
 In any event, viewing the documents most favorably to the Grand Duchess, they only establish that in response to the Grand Duke's representative's (his Privy Purse Minister) insistence that the Grand Ducal Art Collection was private property the Museum Director Kohler sought to obtain an acknowledgement that the Collection was in fact publicly owned. Director Kohler's demand was not a concession that the State did not yet own the paintings, but rather reflected a desire to put to rest on paper the Grand Duke's unsupportable insistence of private ownership. As the German Supreme Court stated in the 1973 case:
 
 
 31
 "the State of Thuringia at the time before the making of the (1927 Agreement) already claimed for itself title to the art collection. By way of the arbitration settlement the title of the state was to be clarified for all purposes." (Emphasis added).
 
 
 32
 It is highly significant in this regard that § 1 of the 1927 Agreement by its terms merely states that the "arbitration defendants acknowledge" public ownership of the Grand Ducal Art Collection (emphasis added); § 1 contains no words of conveyance. This supports KZW's contention that the 1927 Agreement merely confirmed what had already been acknowledged in the 1921 Agreement: the State's title to the Collection.
 
 
 33
 Indeed, § 1 of the 1921 Agreement also uses only the word "acknowledges" rather than any word of conveyance. This supports KZW's contention that public title was automatically established as a matter of German dynastic law upon the abdication in 1918 and that both Agreements merely confirmed the State's title and were not instruments of conveyance.
 
 
 34
 Thus Judge Mishler's holding that the State's ownership of the paintings was established by the 1927 Agreement is fully supported and indeed strengthened by the earlier occurrences, including the 1918 abdication and the 1921 Agreement, which unequivocally rebut the erroneous assumption underlying the Grand Duchess' interpretation of the 1927 Agreement, namely, that the Grand Ducal Art Collection was originally private property and not Krongut or Kammervermoegen, and is therefore governed by §§ 8 and 9 rather than by § 1 of the 1921 Agreement. Moreover, it is undisputed that the 1913 Museum Catalogue, which clearly designates those objects owned privately by the Grand Duke, failed to designate the Duerer paintings as privately owned. Thus the Collection as a whole constituted Krongut or Kammervermoegen and not private property. We hold, therefore, that the paintings, as acknowledged by § 1 of the 1921 Agreement and § 1 of the 1927 Agreement, were the "exclusive property" of the Territory of Weimar.[13]
 
 
 35
 We also reject the Grand Duchess' "reversion" theory, under which she claims that even if the paintings became public property in 1921 she regained title to them when the annuity payments ceased in 1945. By its terms the 1921 Agreement does not condition the State's title to the Collection under § 1 on the continued payment of annuities. Section 17, which governs the payments, merely provides that the annuity is intended to cover the grand Ducal family's claim to "civil lists, maintenance, and other gratuities."[14] Moreover, the Grand Duchess' theory is undermined by the use of the word "eigentum" (i.e., property or title) without any qualification in both the 1921 and 1927 Agreements to characterize the State's interest in the Collection. We thus conclude that the 1921 and 1927 Agreements irrevocably acknowledged the State's ownership of the Duerer paintings.[15]
 
 
 36
 Finally, we affirm the district court's holding that the Grand Duchess' cross-claim for annuities is barred by the Act of State doctrine and by the principles of sovereign immunity. The 1948 Act of the Land of Thuringia extinguishing its debt under the 1921 Agreement is an act of state with respect to a claim having its situs in Thuringia, the locus of the debtor, see Vishipco v. Chase Manhattan Bank, 660 F.2d 854, 862 (2d Cir. 1981). Therefore, the cross-claim for annuities is barred by Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964),[16] and application of the act of state doctrine does not accord extraterritorial effect to the expropriation decree in violation of Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976).[17] Furthermore, her cross-claim is barred by the Foreign Sovereign Immunities Act, whose exception for counterclaims does not apply. 28 U.S.C. § 1607(b). Thus it becomes unnecessary for us to decide whether her claim is also barred by Rule 13, F.R.Civ.P.
 
 
 37
 For the foregoing reasons we affirm the summary judgment entered against the Grand Duchess dismissing her claims.
 
 Elicofon's Claims
 
 38
 Elicofon appeals from the order denying his motion for summary judgment and granting that of KZW. First, he contends that the GDR is not a successor in interest entitled to possession of the paintings. Judge Mishler held that the GDR did succeed to the paintings as property of the Land of Thuringia, either directly by an act of the GDR in 1952 or indirectly as a successor within its territorial jurisdiction to the rights of the Third Reich, to whom the Land's property rights passed. Second, Elicofon argues that subsequent to his purchase he acquired title under the German doctrine of Ersitzung, which awards title to the holder upon 10 years uninterrupted good faith possession. Judge Mishler held that New York's interest in regulating the transfers of property located within its border (in this case for over 30 years) overrides any interest the GDR may have in applying the policy of Ersitzung to extraterritorial transactions. See Cousins v. Instrument Flyers, Inc., 44 N.Y.2d 698, 699, 405 N.Y.S.2d 441, 442, 376 N.E.2d 914, 915 (1978). Thus applying New York's choice of law rules, Ersitzung is inapplicable and New York law governs, under which a purchaser cannot acquire good title from a thief.[18] We affirm both rulings, substantially for the reasons stated in the district court's opinion.
 
 
 39
 Elicofon's third argument is that KZW is barred by New York's statute of limitations from suing to recover the paintings. The essential facts are that in October 1966 Elicofon refused to comply with KZW's demand for the return of the paintings and in April 1969 KZW moved to intervene in this action, which was begun by FRG, thereby commencing KZW's action. See 3B Moore, Federal Practice § 24.12(1), at 503 n.7. The applicable New York statute provides a three (3) year limitation period. N.Y.C.P.L.R. § 214(3). The question is when the limitation period began to run, or, in other words, when KZW's claim against Elicofon accrued. If it accrued only upon Elicofon's refusal in 1966, then the suit was timely commenced. If, on the other hand, it accrued in 1946, when Elicofon bought the paintings, the action would be barred by the then-applicable limitation period of six years[19] unless it was tolled by a subsequent disability before it expired. Judge Mishler held that under New York law KZW's claim accrued in 1966 and that, even if it accrued earlier in 1946, the then-applicable limitation period was tolled under New York's judicially-created "non-recognition" toll because the United States did not recognize GDR until 1974, which precluded the KZW from intervening until then. We agree with both conclusions.
 
 
 40
 Under New York law an innocent purchaser of stolen goods becomes a wrongdoer only after refusing the owner's demand for their return. Until the refusal the purchaser is considered to be in lawful possession. MacDonnell v. Buffalo L., T. & S.D. Co., 193 N.Y. 92, 85 N.E. 801 (1908); Gillet v. Roberts, 57 N.Y. 28 (1874) (conversion); Menzel v. List, 22 A.D.2d 647, 253 N.Y.S.2d 43 (1st Dept. 1964) and 267 N.Y.S.2d 804, 49 Misc.2d 300 (Sup.Ct.N.Y.Co.1966), modified on other grounds, 28 A.D.2d 516, 279 N.Y.S.2d 608 (1st Dept. 1967), modification rev'd, 24 N.Y.2d 91, 298 N.Y.S.2d 979, 246 N.E.2d 742 (1969) (conversion); Cohen v. M. Keizer, Inc., 246 A.D. 277, 285 N.Y.S. 488 (1st Dept. 1936) (replevin); Restatement (Second) of Torts, § 229 (comment h); W. Prosser, The Law of Torts 84 (4th ed. 1971). Where the demand requirement is substantive, that is, where a demand and refusal are requisite elements of the cause of action, it accrues and the statute of limitation begins to run only after such demand and refusal. On the other hand, where the demand is merely procedural, that is, where demand and refusal are not requisite elements of the cause of action and the defendant's actionable conduct was complete prior to demand, § 206(a) of the N.Y.C.P.L.R.[20] governs and the limitation period begins to run when the "right to make the demand is complete." See, e.g., Ganley v. Troy City Nat'l Bank, 98 N.Y. 487, 494 (1885); Frigi-Griffin, Inc. v. Leeds, 52 A.D.2d 805, 383 N.Y.S.2d 339 (1st Dept. 1976); Rossi v. Oristian, 50 A.D.2d 44, 376 N.Y.S.2d 295 (4th Dept. 1975); In re Brady's Will, 286 A.D. 672, 146 N.Y.S.2d 136 (3d Dept. 1955) (all substantive demands); Dickinson v. Mayor of New York, 92 N.Y. 584 (1883) (procedural demand). See generally, 1 Weinstein, Korn & Miller, New York Civil Practice P 206.01, at 2-159-60 (1980). Under these principles, § 206(a) does not apply to substantive demands, and in practice § 206(a)'s actual application "has been extremely limited." Weinstein, Korn & Miller, supra, at P 206.01 at 2-159.
 
 
 41
 Directly on point is a New York decision applying these principles to a case involving a bona fide purchaser of stolen art works, holding that the cause of action accrues only after demand and refusal. In Menzel v. List, supra, the Appellate Division clearly held that the owner's demand on a bona fide purchaser is substantive, that § 206(a) is inapplicable, and that the statute of limitations begins to run only upon the purchaser's refusal to return the property. See also Duryea v. Andrews, 12 N.Y.S. 42 (2d Dept. Genl.T. 1890).[21] Applying these principles here, KZW's cause of action did not accrue until October 1966 when Elicofon refused to comply with the demand for the return of the paintings. Since the action was begun in 1969, within the three-year limitation period, it is not barred.
 
 
 42
 Elicofon does not dispute that a demand must be made by the true owner upon the bona fide purchaser of stolen goods before suit for recovery may be brought. Nevertheless, he seeks on several grounds to avoid the conclusion reached in Menzel, based upon the distinction between substantive and procedural demands, maintaining that the cause of action accrued instead in 1946 upon his purchase. Under this view the statute of limitations would begin to run, and might expire, even where under established New York law the bona fide purchaser had yet to commit a wrong against the true owner. We decline to adopt such reasoning. We address Elicofon's three major reasons for rejecting the Menzel holding.
 
 
 43
 First, Elicofon reads § 206(a) as applicable not simply where a cause of action exists prior to the demand, but rather where a right to possession exists before the demand. Therefore, he argues, since KZW's right to regain possession of the paintings from Elicofon existed in 1946, the statute of limitations began to run at that point. He cites no authority for this interpretation, but relies somewhat elliptically on the predecessor to § 206(a), § 410 of the Code of Civil Procedure, whose opening phrase was worded as follows: "Where a right exists, but a demand is necessary to entitle a person to maintain an action...." (Emphasis added.) He argues that, since the current § 206(a), without the underlined phrase, is not intended to have a different meaning, § 206(a) applies where a "right to possession" exists prior to demand. Such a view would eviscerate the undisputed distinction in New York law between substantive and procedural demands, since substantive demands are often if not typically made by an owner who concededly has title to the property whose return he is demanding. Indeed, the very notion of a substantive demand requirement is that, despite having a right to the property, the true owner must nevertheless demand its return and be refused before he has a cause of action at all against the refuser. We therefore reject Elicofon's attempt to re-interpret § 206(a) to render meaningless the concept of substantive demand. Indeed, the predecessor, § 410, had been interpreted as having the same meaning as that later attributed to § 206(a). In Dickinson v. Mayor of New York, supra, the New York Court of Appeals had recognized the distinction between procedural and substantive demands and held § 410 applicable only to procedural demands. 92 N.Y. 584 (1883). See also 2 Carmody-Wait § 98, at 270 (1952) (the phrase "Where a right exists" in § 410 merely means "where a right of action or cause of action exists"); 1 Bender's Forms for the Civil Practice Acts, 12-13 n.7 (1962).
 
 
 44
 Elicofon next contends that New York cases decided subsequent to Menzel cast doubt on its continued validity and compel the different conclusion that § 206(a) is applicable to substantive demands and that therefore the cause of action arose in 1946. Of the four post-Menzel cases cited to us, only one involves a bona fide purchaser. Stroganoff-Scherbatoff v. Weldon, 420 F.Supp. 18, 22 n.5 (S.D.N.Y.1976). We cannot accord weight to its statement contrary to Menzel since it was dictum in a gratuitous footnote which amounted to an unnecessary effort by a federal district court to interpret state law. The decision in Federal Insurance Co. v. Fries, 78 Misc.2d 805, 355 N.Y.S.2d 741 (N.Y.Civ.Ct.1974), is clearly distinguishable since it held in a mistaken delivery case (unlike a bona fide purchaser case) that the cause of action accrues upon the mistaken delivery, not upon demand.[22] In addition, its validity is doubtful since it neither discusses the established New York substantive/procedural distinction nor alludes to Menzel, a precedent by a higher court in the same department. Similarly, we cannot accord much weight to Smith v. Driscoll, 69 A.D.2d 857, 415 N.Y.S.2d 455 (2d Dept. 1979), where in a case also not involving a bona fide purchaser the Appellate Division, in one short sentence and without any discussion of Menzel or of the substantive/procedural distinction, affirmed the lower court's dismissal of a conversion claim as time-barred, relying on Fries. Finally, in Al-Roc Product Corp. v. Union Dime Savings Bank, 74 A.D.2d 834, 425 N.Y.S.2d 525 (2d Dept. 1980), the court's one-sentence statement is a skeletal memorandum opinion that a cause of action against a wrongful possessor accrues upon the wrongful possession is dictum, since the court held that the conversion action was timely. Having reviewed these decisions, we do not alter our conclusion that Menzel and its underlying principles are controlling.
 
 
 45
 Third, Elicofon contends that the Menzel rule should be abandoned because it favors a thief as against a bona fide purchaser, since for a thief the statute of limitations begins to run immediately upon the theft while a bona fide purchaser must wait, possibly indefinitely, for a demand from the owner. Insofar as a bad faith purchaser is treated as a thief for the purposes of the statute of limitations, Elicofon contends that the bad faith purchaser is also preferred by the Menzel rule to the good faith purchaser. This, he argues, is anomalous, since the demand rule, whose original rationale was to ensure that the innocent purchaser would be informed of his defect in title before being made liable as a tortfeasor, Gillet v. Roberts, supra, 57 N.Y. at 34, is intended for the benefit of the innocent purchaser.
 
 
 46
 We are persuaded by the decision of the New York Court of Appeals in General Stencils, Inc. v. Chiappa, 18 N.Y.2d 125, 272 N.Y.S.2d 337, 219 N.E.2d 169 (1966), that the Menzel rule does not prefer the thief or bad faith purchaser over the bona fide purchaser. In Chiappa the court held that familiar principles of equitable estoppel will prevent a wrongdoer from asserting the statute of limitations defense and thereby "take refuge behind the shield of his own wrong." 272 N.Y.S.2d at 127, 219 N.E.2d 169.[23] But even if New York law might occasionally favor the thief or bad faith purchaser, we are charged only with applying New York law, not with remaking or improving it.[24] As between the policy, urged by Elicofon, of allowing the statute of limitations to run against an owner regardless of his ignorance, and tolling it indefinitely against a good faith purchaser until a demand is made, we are satisfied that New York has chosen the latter course.[25] We therefore hold that the cause of action accrued in 1966 and the statute of limitations did not begin to run until then.
 
 
 47
 Even were we to assume that under New York law KZW's cause of action accrued in 1946, we would affirm Judge Mishler's holding that the statute of limitations was tolled under New York's judicially created "non-recognition" toll until 1974, when the United States first recognized the GDR. See Steingut v. Guaranty Trust Co., 58 F.Supp. 623 (S.D.N.Y.1944). See also Guaranty Trust Co. v. United States, 304 U.S. 126, 136-37, 58 S.Ct. 785, 790, 82 L.Ed. 1224 (1938) (adverting to New York rule); Jacobus v. Colgate, 217 N.Y. 234, 244-45, 111 N.E. 837 (1916) (the statute does not begin to run "until the state has supplied him (the suitor) with a tribunal in which his suit may be maintained"). See also Homer Eng. Co. v. State, 12 N.Y.2d 508, 240 N.Y.S.2d 973, 191 N.E.2d 455 (1963). Since the then-applicable limitation was at least six years, the statute of limitations had not run by 1949, when the GDR government was founded, and it was thereafter tolled by our non-recognition of the GDR. See Hanger v. Abbott, 73 U.S. (6 Wall) 532, 18 L.Ed. 939 (1868) (after-arising war time disability suspends running of statute of limitations); Osbourne v. United States, 164 F.2d 767 (2d Cir. 1949). Cf. Chastener v. Kice, 270 F.Supp. 432, 439 (E.D.N.Y.1967) (after-arising disability in insanity context).
 
 
 48
 Elicofon responds that the non-recognition toll is inapplicable since from 1949 until 1974 this country recognized the FRG government as the only government entitled to speak for the entire German people. Therefore, his argument goes, under the principles of Guaranty Trust, supra, the statute of limitations was not tolled since the U.S. courts were available to the FRG as the recognized sovereign of the German State.[26] 304 U.S. at 137-40, 58 S.Ct. at 791. We reject the premise of this argument. The United States itself recognized the FRG only "as sovereign over its own territory and not over that of East Germany" and as not "having any territorial jurisdiction, either de facto or de jure, over East Germany." Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, 293 F.Supp. 892, 900, 911 (S.D.N.Y.1968), modified on other grounds, 433 F.2d 686 (2d Cir. 1970), cert. denied, 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971). The view of the United States is consistent with that taken by the government of West Germany, which "did not purport to exercise sovereign authority with regard to matters in East Germany, either de jure or de facto." Id. at 912.
 
 
 49
 Notwithstanding the GDR's disability to sue from 1949 onward, Elicofon maintains that the statute of limitations nevertheless began to run uninterrupted from 1946 because at all times thereafter the United States' courts were available to parties competent to sue on behalf of the GDR. He claims that from 1945 to 1949 the Allied Powers acting through the Allied Control Council, and from 1949 the FRG government, could have brought suit to assert the GDR's claim to the paintings on its behalf. We find no support for the proposition that the Allied Council could have brought suit in American courts to assert the interests of the predecessor of the GDR within its territorial boundary; Elicofon concedes that he is aware of no such suits. In any event the six-year limitations period would not have run by 1949, when the Allied Control Council ceased acting as the government of occupied Germany, in view of the Soviets' withdrawal from the Council. The Soviets had been empowered to act with respect to its "zone of occupation," which included Weimar. Moreover, in any such hypothetical suit the state of war that officially remained in effect until 1951 would have cast serious doubt upon the Allied Council's capacity to sue since at least technically it would be viewed as a military government in charge of an enemy and the recognized procedure for recovery of German-owned property in the United States was governed by the Trading With the Enemy Act. See Ex Parte Colonna, 314 U.S. 510, 511, 62 S.Ct. 373, 374, 86 L.Ed. 379 (1942); Trading With the Enemy Act of 1917, 50 U.S.C.App. § 2(b).
 
 
 50
 Even if the Allied Council could have brought suit on behalf of the GDR's predecessor, and it is clear that the FRG could have sued and in 1969 did sue on behalf of the GDR, at most they would have been acting as trustees for the GDR's interests. FRG's complaint, for instance, expressly states that it was suing merely to obtain "custody of the possession of the Duerer paintings in order ultimately to restore them to the person or party who is truly and rightfully entitled to their possession." The United States' "Suggestion of Interest" submitted in this litigation states that it recognizes the FRG as "entitled in this litigation to represent the Weimar Museum (i.e., KZW) as trustee of its interests." (emphasis added).[27] Under New York law the commencement of a prior action by a trustee or guardian does not thereby lift the disability toll accorded the beneficiary. Carr v. Allied Aviation Service Corp., 40 A.D.2d 608, 335 N.Y.S.2d 914 (2d Dept. 1972); Williams v. Bd. of Educ., 182 Misc. 619, 45 N.Y.S.2d 385 (S.Ct. 1943); Wolf v. United States, 10 F.Supp. 899 (S.D.N.Y.1935). A fortiori the rule governs here, where Elicofon's only claim is that the Allied Council or the FRG might or could have sued as trustee between the years 1946 and 1969. We hold, therefore, that even if the cause of action accrued in 1946 the statute of limitations was tolled and KZW's suit is timely.
 
 
 51
 Elicofon's other claims are also rejected. We affirm the district court's rejection of his argument that he acquired good title upon his purchase from a custodian of the paintings, its finding that the paintings were stolen between June 12 and July 19, 1945, its conclusion that Dr. Scheidig's efforts to locate the paintings were reasonably diligent, and its ruling that any delay in demanding the return of the paintings was reasonable and excusable as a matter of law. We also affirm the denial of Elicofon's motion to compel discovery on the grounds stated in Judge Mishler's unpublished opinion dated February 23, 1976. In light of our conclusion that the German doctrine of Ersitzung is inapplicable, we do not reach Elicofon's contention that summary judgment on the proper application of Ersitzung was inappropriate in light of the controversies among the various German law experts.
 
 
 52
 Accordingly, we affirm the district court's holding that KZW is entitled to possession of the paintings, and order that the judgment entered below be enforced.
 
 
 
 [1]
 The paintings are portraits of Hans Tucher and of his wife Felicitas Tucher, painted in oil on wood and measuring 28 X 24 cm. each
 
 
 [2]
 The claim that title automatically passed in 1918 is not inconsistent with the provisional government's issuance of a decree in 1919 sequestering all property of the Grand Ducal family, since sequestration is often used to freeze the status quo and therefore does not necessarily constitute a tacit acknowledgement that the sequestered property is privately held
 
 
 [3]
 Section 17 provided that the Grand Duke, beginning on January 21, 1921, would each year receive from the Territory of Weimar an annuity of 300,000 marks out of which all claims of the Grand Ducal family to civil lists, maintenance and other gratuities would be paid; that the annuity would continue to be paid to existing male descendants of the Grand Duke after his decease; that upon extinction of the male line, a reduced annuity of 100,000 marks would be paid to his female descendants; and that as further settlement for the "concessions made by the Grand Duke, particularly in ceding highly valuable collections and objects d'art the Grand Duke shall be paid a special compensation of three million marks."
 
 
 [4]
 By this time, about 1924, the collection was no longer called the Grand Ducal Art Collection, but rather the State Art Collection of Weimar (Staatliche Kunstsammlungen zu Weimar)
 
 
 [5]
 Thuringia, which was created by Federal German Law of April 20, 1920, first included as a municipal association Sachsen-Weimar-Eisenach, the territory over which the Grand Dukes formerly presided. The municipal association was dissolved effective April 1, 1923, and the assets of the Weimar District became the property of the Land of Thuringia
 
 
 [6]
 The Grand Duchess does not make an issue of the manner in which KZW claims to have succeeded to the paintings, whether directly from the Land of Thuringia or indirectly through the Third Reich, since in either case the premise is that the Land of Thuringia and not she owns the paintings. Elicofon, however, does raise this issue as part of his claim that, although the paintings became public property, title to them did not pass to the GDR but instead to the FRG
 
 
 [7]
 The precise basis of the Grand Duchess' claim is somewhat ambiguous. Her amended intervenor complaint states that either the Territory of Weimar never acquired title or that it acquired title conditioned upon its continued payment of annuities provided for in the 1921 Agreement. Plaintiff Intervenor Complaint & Crossclaim (April 9, 1975) P 19. The claim that title never passed is based on the theory that the Duerer paintings were privately owned and thus governed by §§ 8 and 9 of the 1921 Agreement, which provide that title passes to the Territory only when the male heirs become extinct, a condition not fulfilled even today. Her alternative claim is that although title may have passed in 1921 it was conditioned on the continued payment of annuities
 
 
 [8]
 Judge Mishler found that as a matter of law KZW had presented a prima facie case based largely on the testimony of Dr. Scheidig that the paintings were stolen some time between these dates and that Elicofon's attempts to rebut the proof failed. We find no reason to disturb Judge Mishler's assessment
 
 
 [9]
 Elicofon collected primarily oriental art and prior to W.W. II had roughly 2,000 pieces in his Brooklyn house
 
 
 [10]
 The decision is precedent only and not res judicata. In 1973 the Grand Duchess sued the FRG to recover three paintings stolen from the Weimar Museum in April 1921. Subsequent to their theft they were discovered in the United States, seized under the Trading With the Enemy Act, 50 U.S.C.App. §§ 1, et seq., and in 1966 pursuant to an Act of Congress delivered to the FRG in trust for the Weimar Museum. An Act to amend the Trading With the Enemy Act to provide for the transfer of three paintings to the Federal Republic of Germany in trust for the Weimar Museum, Pub.L.No. 89-619, 80 Stat. 871 (1966) (codified at 50 U.S.C.App. § 39(e)). In November 1973 the Bundesgerichtshof (FRG Supreme Court) held that the two paintings that were part of the former Grand Ducal Art Collection (the Tischbein and Terborch) became public property under the 1927 Agreement, and therefore could not be claimed by the Grand Duchess as her private property. With respect to the third painting, a Rembrandt, that was not part of the Grand Ducal Art Collection, the German Supreme Court held that it was private property inherited by the former Grand Duchess Sophie and was specifically reserved to her by §§ 8 and 9 of the 1921 Agreement. In the Lawsuit of the Archduchess Elizabeth of Saxony Weimar Eissenach v. Federal Republic of Germany (Nov. 28, 1973)
 
 
 [11]
 Rule 13(g) provides:
 "(g) Cross-Claim Against Co-Party. A pleading may state as a cross-claim any claim by one party against a co-party arising out of the transaction or occurrence that is the subject matter either of the original action or of a counter-claim therein or relating to any property that is the subject matter of the original action. Such cross-claim may include a claim that the party against whom it is asserted is or may be liable to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant."
 
 
 [12]
 Elicofon advanced the theory that the paintings may have been removed from the castle by Fassbender, a German architect who lived on the grounds and was allegedly a de facto custodian of the stored artwork. Elicofon maintained that under German law Fassbender could have conveyed good title even though he himself did not have title, and that the good faith purchaser or transferee could in turn have transferred good title to Elicofon. Judge Mishler discussed the German law issues at length and dismissed the argument on the grounds of German legal doctrine and the fact that evidence of Fassbender's role "is so insubstantial (that it) does not raise a genuine issue of fact." We agree
 
 
 [13]
 We need not decide whether the State's title to the Collection was automatically established in 1918 upon the Grand Duke's abdication, or had to await formalization in the 1921 Agreement. We rely on the 1921 and 1927 Agreements as sufficient
 
 
 [14]
 Section 17's provision for a lump sum payment is not at issue here, and in any event appears to be consideration only for the Grand Duke's ceding of § 8 privately-owned paintings to the State, not for his acknowledgement of public title to Krongut or Kammervermoegen
 
 
 [15]
 Since State title to the Collection was irrevocably acknowledged in 1921, KZW's claim of ownership in no way turns on the legality of the termination of annuity payments in 1945
 
 
 [16]
 There is no express statement by the Executive Branch that the doctrine need not be applied in this instance. See Banco Nacional de Cuba v. Chase Manhattan Bank, 658 F.2d 875, 844 (2d Cir. 1981); Empressa Cubana Exportadora, Inc. v. Lamborn & Co., 652 F.2d 231, 237-38 (2d Cir. 1981)
 
 
 [17]
 Since the situs of the annuity claim is in Thuringia, barring that claim does not accord the expropriation decree extraterritorial effect. The only remaining claim of extraterritoriality would have to rest on the theory that KZW's title to the paintings, which were in the United States at the time of the expropriation decree, depended on our enforcing that decree in this country to bar the Grand Duchess' assertion of title based on termination of the annuity payments in 1945. Republic of Iraq v. First National City Bank, 353 F.2d 47 (2d Cir. 1965). However, since KZW's title to the paintings was perfected at least by 1927 and was not conditioned on the continued payment of annuities, its title does not depend on our enforcement of the expropriation decree abrogating its annuity obligation
 
 
 [18]
 Even under German law at the time of the theft transfer of valid title to Elicofon was prohibited. Allied Military Government Law No. 52 (reprinted in W. Friedmann, The Allied Military Government of Germany, 303-07 (1947))
 
 
 [19]
 The then-applicable limitation period was at least six years for an action at law to recover a chattel. C.P.A. § 49(4). Insofar as KZW's claim is in the nature of equitable replevin, the longer 10-year period of C.P.A. § 53 would have applied
 
 
 [20]
 Section 206(a) provides in pertinent part:
 "Where a demand is necessary to entitle a person to commence an action, the time within which the action must be commenced shall be computed from the time when the right to make the demand is complete...."
 
 
 [21]
 Menzel has subsequently been cited in Frigi-Griffin, Inc. v. Leeds, 52 A.D.2d 805, 383 N.Y.S.2d 339 (1st Dept. 1976), and recently by the New Jersey Supreme Court as the New York rule. O'Keeffe v. Snyder, 83 N.J. 478, 489-90, 416 A.2d 862, 868 (1980)
 
 
 [22]
 The mistaken delivery cases seem to be noteworthy for their inconsistent results. See, e.g., F. I. duPont, Glore, Forgan & Co. v. Ladenheim, N.Y.L.J., May 20, 1975, at 2, col. 2 (App.T. 1st Dept. 1975); H. S. Equities, Inc. v. Leeds, 47 A.D.2d 815, 367 N.Y.S.2d 956 (1st Dept. 1975), affirming Special Term No. 8762/1973 (Sup.Ct.N.Y.Co. March 29, 1974). In a mistaken delivery case the rightful deliveree is likely to complain. Since the deliverer who made the mistake is known to the owner, the owner has a much greater ability to identify the wrong deliveree and locate the goods than does an owner of stolen goods. In contrast, the thief is usually unknown and the good faith purchaser, also unknown to the owner, is ignorant of both the defect in his title and the origin of the goods
 
 
 [23]
 Elicofon argues that under Chiappa estoppel will arise only against a wrongdoer who commits egregious, affirmative acts of concealment, which would not be satisfied if, for example, a bad faith purchaser merely displays stolen paintings in his home. We disagree with such a narrow reading of Chiappa. Fairly read, Chiappa stands for the general proposition, resting on estoppel principles, that a defendant who commits affirmative wrongdoing should not be afforded the benefits of the statute of limitations defense. See, e.g., Greenfield v. Kanwit, 87 F.R.D. 129 (S.D.N.Y.1980) (broad estoppel rationale underlies Chiappa); Clark v. United States, 481 F.Supp. 1086, 1095 (S.D.N.Y.1979) (affirmative concealment, fraud, misrepresentation or deception will toll the statute of limitations under Chiappa). Thus in Chiappa itself the Court stated that the very fact of defendant's thievery entitles plaintiff to litigate the estoppel issue, and went on to say that plaintiff may not prevail if defendant can show that plaintiff's non-discovery of the theft was due to plaintiff's own negligence or acquiescence. Significantly, the Court did not state that to prevail on the estoppel issue the plaintiff must show egregious, affirmative acts of concealment. Id. at 128, 219 N.E.2d 169. In the instant case we have concluded that KZW is not responsible for the late discovery of the paintings' whereabouts. See pp. 1165-1166, infra
 
 
 [24]
 Even if such an anomaly existed, which we do not believe to be the case in view of Chiappa, a logical approach would be to toll the statute of limitations against the thief until demand and refusal, thus insuring that the thief and the good faith purchaser would be on an equal footing vis-a-vis the statute of limitations. However, the good faith purchaser would overall be more favorably treated, since unlike the thief, he is not liable for any loss or damage to the property prior to demand and refusal. Gillet v. Roberts, 57 N.Y. 28 (1874); Hovey v. Bromley, 33 N.Y.S. 400 (5th Dept. 1895)
 
 
 [25]
 Two arguably less rigid approaches are possible. Some jurisdictions have transplanted adverse possession principles to determine when the statute of limitations begins to run against a good faith purchaser, and one commentator suggests commencing the running of the limitations period at the point when the owner either knew or should have known of the stolen property's whereabouts. Comment, "The Recovery of Stolen Art: Of Paintings, Statutes and Statutes of Limitations," 27 U.C.L.A.L.Rev. 1122 (1980). Under either approach KZW's suit would still have accrued no earlier than 1966. Courts and commentators have noted that the mere residential display of paintings may not constitute the type of open and notorious possession sufficient to afford notice to the true owner. See, e.g., O'Keeffe v. Snyder, 107 N.J.Super. 75, 405 A.2d 840 (Sup.Ct.App.Div.1979) (holding predominantly private display of stolen artworks insufficiently open and notorious), rev'd, 83 N.J. 478, 416 A.2d 862, 871-73 (1980) (noting difficulties with and rejecting application of adverse possession doctrine to chattels); Comment, supra, at pp. 1142-44 & n.86 (cases cited therein). Elicofon's private display of two unsigned paintings which remained unidentified until 1966, even if seen by many persons who visited the home, clearly did not afford KZW a reasonable opportunity to discover their whereabouts. Similarly, even if New York had a reasonable inquiry rule under which the statute of limitations begins to run when the owner knew or should have known of the stolen property's location, the GDR exercised reasonable diligence and cannot be held responsible for the late discovery of the Duerer paintings. See pp. 1165-1166, infra
 
 
 [26]
 The argument that the FRG exercised sovereignty over all of Germany must be distinguished from the different argument that the FRG and not the GDR is the successor in interest to the property rights of predecessor states
 
 
 [27]
 Indeed, the 1966 Act amending the Trading With the Enemy Act to transfer to the FRG the three paintings that later were the subject of the 1973 German Supreme Court decision (see n. 10, supra) is consistent with the view of FRG as trustee for the GDR. The amending Act added § 39(e) to the Trading With the Enemy Act, and reads in relevant part as follows:
 "(e) ... the Attorney General is hereby authorized to transfer the three paintings ... to the Federal Republic of Germany, to be held in trust for eventual transfer to the Weimar Museum, Weimar, State of Thuringia, Germany, in accord with the terms of an agreement to be made between the United States and the Federal Republic of Germany. 50 U.S.C.App. § 39(e)." (Emphasis added.)