GEMINI SHIPPING, INC.,
Plaintiff-Appellant,

v.

FOREIGN TRADE ORGANIZATION
FOR CHEMICALS AND FOODSTUFFS
and Syrian General Organization for
Maritime Transport, Defendants-Appellees.

No. 656, Docket 80–7851.

United States Court of Appeals,
Second Circuit.

Argued March 6, 1981.

Decided April 16, 1981.

Howard M. McCormack, New York City
(John P. O'Donnell, Healy & Baillie, New
York City, of counsel), for plaintiff-appellant.

James S. Morris, New York City (Michael
S. Press, Whitman & Ransom, New York
City, of counsel), for defendants-appellees.

Before KAUFMAN and TIMBERS, Circuit Judges, and WARD, District Judge.*

IRVING R. KAUFMAN, Circuit Judge:

I

This appeal presents issues sufficiently
similar to those resolved today in *Texas
Trading & Milling Corp. v. Federal Republic
of Nigeria*[1] that we need only apply much

---

* Of the United States District Court for the
Southern District of New York, sitting by designation.

1. *See Texas Trading & Milling Corp. v. Federal
Republic of Nigeria*, 647 F.2d 300 (2d Cir.
1981). *Texas Trading* and this case are
two of seven appeals decided today involving

the Foreign Sovereign Immunities Act of 1976,
Pub.L. 94–583, 90 Stat. 2891, *codified at* 28
U.S.C. §§ 1330; 1332(a)(2)–1332(a)(4); 1391(f);
1441(d); and 1602–1611. In the *Texas Trading*
opinion, we disposed of three other cases as
well. They are: *Decor by Nikkei International,
Inc. v. Federal Republic of Nigeria*, No. 80–
7783; *Chenax Majesty, Inc. v. Federal Republic*

of the doctrine developed there to the facts at issue here. "Tafco" is an imperfect acronym for the Foreign Trade Organization for Chemicals and Foodstuffs. Tafco is wholly owned by the Syrian government; it buys food for consumption in Syria. "Syriamar" is similar shorthand for the Syrian General Organization for Maritime Transport. Syriamar is also wholly owned by the Syrian government; it hires ships for the use of the Syrian government.

Between 1976 and 1979, Tafco made several purchases of rice and soybeans under a United States government program popularly known as "P.L. 480."[2] Under P.L. 480, the U.S. Department of Agriculture provides financing for sales of food by American corporations to friendly foreign countries. P.L. 480 requires the buying nation to publish in the United States "invitations for bids." The invitations are opened in the United States. Then, the sales are effected through government-to-government diplomatic negotiations, and are consummated in the buying country. Half the goods sold must be transported on American ships.

Syria's P.L. 480 purchases involved numerous telexes from Syria to the United States, visits to the United States by Tafco officials, and the receipt of food contract bids at the Syrian embassy in Washington. Tafco did not, however, maintain an office in the United States, and did not execute the contracts of sale here. Syriamar retained a shipping agent in the United States to secure transportation for the food Tafco bought.

The sale most relevant here occurred in 1976, when Tafco bought 10,727 metric tons of rice through the P.L. 480 program from the Connell Rice & Sugar Co. of Westfield, New Jersey. Under the terms of the rice contract, Tafco established a letter of credit in Connell's favor at the Commercial Bank of Syria Ltd. That bank advised the letter of credit through the Chase Manhattan Bank in New York, and Chase confirmed it. If Connell wanted to collect, Connell presented documents to Chase, and Chase paid Connell for Tafco.

The rice was at a port in California. Syriamar contracted for the shipping with International Trading and Shipping Enterprises, S.A. ("Itrash"), a Belgian corporation. Itrash secured the shipping through Gemini Shipping, Inc., a New York corporation.[3] Their agreement provided that Itrash would pay 90% of the freight charges to Gemini when the ship was loaded in California. If Itrash did not pay, Gemini had a right of lien over the ship's cargo.

Gemini hired a ship, and it was loaded in California on August 31, 1976. Gemini demanded payment of 90% of the freight charges from Itrash (about $300,000), and Itrash insisted on deducting $80,000 for certain port charges. As the ship left California, Gemini became concerned about Itrash's ability to pay both the freight charges and the demurrage (should it be incurred), and telexed Tafco on September 1 that it intended to exercise its right of lien over the cargo. Tafco and Syriamar telexed Gemini on September 2 in New York that Tafco had already paid Itrash, and should not have to pay twice. The Syrians' telex also stated, however, "we guarantee to pay you demurrages at both ends." The telex did not specify where payment would be made.

Itrash paid Gemini the freight charges on September 7, while the ship was between California and Syria. The ship continued to Syria, and arrived on September 23. In alleged reliance on the demurrage guaran-

---

of Nigeria, No. 80–7771; and East Europe Import-Export, Inc. v. Federal Republic of Nigeria, No. 80–7773. The other two cases of the seven were treated in separate opinions. They are Verlinden B. V. v. Central Bank of Nigeria, 647 F.2d 320 (2d Cir. 1981), and Reale International, Inc. v. Federal Republic of Nigeria, 647 F.2d 330 (2d Cir. 1981).

2. See 7 U.S.C. §§ 1427, 1431, 1691 et seq.

3. Gemini is a ship charterer. It promises one party it will transport goods by sea, and it secures shipping from another party to fulfill the promise.

tee, Gemini forbore exercising its right of lien over the cargo, and freed the vessel to be unloaded. The ship encountered substantial delays at the port, and took 115 days to discharge the rice. The demurrage incurred amounted to $378,957 under Gemini's agreement with Itrash. Itrash refused to pay. Gemini sued Itrash in England, and secured a default judgment. It remains unpaid.

Gemini then asked Tafco and Syriamar to honor their demurrage guarantee. They refused. Gemini sued them in the Southern District of New York, claiming jurisdiction under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1330 ("FSIA" or "Act"). Defendants moved to dismiss. Taking the allegations of plaintiff's complaint as true, as we have in setting forth the facts above, the district court, 496 F.Supp. 256, granted the motion. This appeal followed.

## II

■ The relevant legal provision is the first clause of § 1605(a)(2) of the Act, providing for jurisdiction over any suit "based upon a commercial activity carried on in the United States by the foreign state."[4] It is clear beyond doubt that defendants' activity here was "commercial" under 28 U.S.C. § 1603(d). At hearings before the passage of the Act, one of the drafters of the FSIA stated of § 1603(d), "This would mean, for example, that a foreign state's purchase of grain from a private dealer would always be regarded as commercial ...." *Hearings on H.R. 11315 Before the Subcommittee on Administrative Law and Governmental Relations of the House Committee on the Judiciary*, 94th Cong., 2d Sess. 27 (1976) ("*1976 Hearings*") (testimony of Monroe Leigh, Legal Adviser, Department of State). The suit is "based upon" the com-

mercial activity because the guarantee was part and parcel of the rice sale. It was made when Gemini threatened to exercise its lien, and was breached after Gemini released the grain. While, in a narrow sense, Gemini's suit might be said to be "based upon" only the breach of the guarantee, the drafters of the FSIA intended no such niggardly construction.

■ We therefore need decide only whether, under the language of § 1605(a)(2), the commercial activity here was "carried on in the United States." Section 1603(e) of the Act provides that a commercial activity is carried on here if it has "substantial contact with the United States." Defendants' conduct certainly satisfies that standard, for Syria solicited bids in the United States, and paid under the contract through a letter of credit confirmed by a New York bank. The House Report to the bill that became the FSIA lists "import-export transactions involving sales to, or purchases from, concerns in the United States" among the conduct within the first clause of § 1605(a)(2). House Judiciary Committee, *Jurisdiction of United States Courts in Suits Against Foreign States*, H.R.Rep. No. 1487, 94th Cong., 2d Sess. 16, *reprinted in* [1976] U.S.Code Cong. & Admin.News 6604, 6615 ("*House Report*"). Moreover, Syria received financing for the transaction from the Department of Agriculture; the House Report states that the "substantial contact" standard of § 1603(e) can be satisfied by as little activity as "receiv[ing] financing from a private or public lending institution located in the United States." *Id.* at 6615–16. In fact, one of the experts who testified before passage of the Act referred specifically to P.L. 480 sales as a target of the bill. *See 1976 Hearings* at 96 (testimony of Michael M. Cohen, Chairman, Committee on Maritime

---

4. Section 1605(a)(2) provides in full:
   (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
   . . . .
   (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act

performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

Legislation, Maritime Law Association of the United States). The events at issue are therefore sufficiently tied to the United States to place this case within the class of suits over which Congress intended to confer jurisdiction when it passed the FSIA. *See Texas Trading & Milling Corp. v. Federal Republic of Nigeria, supra.*[5]

Since this case involves a commercial activity carried on in the United States under § 1605(a)(2), subject matter jurisdiction is present, *see* 28 U.S.C. § 1330(a),[6] as is personal jurisdiction, *see id.* at § 1330(b). Accordingly, there remains only the inquiry whether defendants' contacts with the United States are sufficient to square exercise of that jurisdiction with the due process clause. Tafco has a plethora of "contacts," *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), with the United States, including the solicitation of P.L. 480 bids here, trips taken by officers, the receipt of American government financing, and the establishment of a confirmed letter of credit at Chase. Syriamar maintained a shipping agent here, and made contracts here. Defendants have "avail[ed themselves] of ... the benefits and protections" of American law in many ways, *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958), and the exercise of jurisdiction is constitutionally proper. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

The order is reversed, and the case is remanded for proceedings consistent with this opinion.

---

**5.** Whether jurisdiction is present here under the third clause of § 1605(a)(2) remains an open question. *See Texas Trading & Milling Corp. v. Federal Republic of Nigeria, supra* note 1, at 312 n. 35.

**6.** Since Gemini is a New York corporation, the statutory subject matter jurisdiction finds a constitutional basis in the diversity grant. *See Texas Trading & Milling Corp. v. Federal Republic of Nigeria, supra.*