708 F.2d 80
 MINISTRY OF SUPPLY, CAIRO, and General Authority for Supply
Commodities, Cairo, Plaintiffs and
Cross-Defendants-Appellees,
Babanaft International Co., S.A., Intervenor Plaintiff and
Cross-Claimant-Appellant,
v.
UNIVERSE TANKSHIPS, INC., Claybridge Shipping Co., S.A., and
M/S ULYSSES, in rem, Defendants.
 No. 1233, Docket 83-7106.
 United States Court of Appeals,
Second Circuit.
 Argued April 28, 1983.
Decided May 23, 1983.
 
 Thomas E. Stiles, New York City (Lilly, Sullivan & Purcell, P.C., George W. Sullivan, New York City, of counsel), for intervenor-plaintiff and cross-claimant-appellant.
 William J. Burke, New York City (Poles, Tublin, Patestides & Stratakis, New York City), for plaintiffs and cross-defendants-appellees.
 Before FRIENDLY, KEARSE and WINTER, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 This appeal is from an order of Judge Owen in the District Court for the Southern District of New York dismissing, on grounds of sovereign immunity, the cross-claim of appellant Babanaft International Co., S.A. (Babanaft), which had been granted permissive intervention pursuant to F.R.Civ.P. 24(b), against the Ministry of Supply, Cairo, and General Authority for Supply Commodities, Cairo, (collectively referred to as the Ministry or the plaintiffs), in a suit for cargo damage brought by the Ministry against the ship M/S Ulysses, Universe Tankships, Inc., and Claybridge Shipping Co., S.A. Concededly the plaintiffs are an "agency or instrumentality" of Egypt and thus a "foreign state" within Sec. 4(a), 28 U.S.C. Sec. 1603(a) and (b) of the Foreign Sovereign Immunities Act of 1976 (FSIA or Act). We have characterized FSIA as "a new and vaguely-worded statute" whose draftsmen deliberately left decision of many difficult questions to the federal courts, Texas Trading & Milling Corp. v. Federal Republic of Nigeria, 647 F.2d 300, 302-03 (2d Cir.1981), cert. denied, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). While the opinion in Texas Trading and the three other opinions handed down with it, Gemini Shipping, Inc. v. Foreign Trade Org. for Chemicals & Foodstuffs, 647 F.2d 317 (2 Cir.1981); Verlinden B.V. v. Central Bank of Nigeria, 647 F.2d 320 (2 Cir.1981), cert. granted, 454 U.S. 1140, 102 S.Ct. 997, 71 L.Ed.2d 291 (1982); Reale International, Inc. v. Federal Republic of Nigeria, 647 F.2d 330 (2 Cir.1981), settled many such questions for this circuit, this case presents an issue with respect to the interpretation of FSIA not directly decided there.
 
 
 2
 The Ministry is engaged, inter alia, in carrying out in the United States a program for the purchase of grain and its transportation to Egypt under P.L. 480, 7 U.S.C. Sec. 1691 et seq., similar to that carried out by an agency of the government of Syria as described in Gemini Shipping, supra, 647 F.2d at 318-20. Defendant Universe Tankships, Inc. (Universe), a Liberian corporation with an office in New York, is the owner of the Liberian flag motorship M/S Ulysses.
 
 
 3
 On March 14, 1979, Universe had entered into a time charter of the Ulysses to appellant Babanaft, a Panamanian corporation headquartered in Greece, for a period of 12 months from April 1, 1979, with an option to Babanaft to extend this for an additional nine months, at a fixed rate of $2.78 per deadweight ton per month to be paid to Universe at its New York office, plus an additional $600 per month to cover specified expenses, the cost of fuel, port charges, and many other items. Universe undertook to make and maintain the Ulysses tight, staunch, strong, in good order and condition and in every way fit for service. Babanaft, on April 4, 1979, entered into a charter with defendant Claybridge Shipping Co., S.A., another Panamanian corporation headquartered in Greece, for a voyage from Florida to a Mediterranean port or ports. The Ministry's complaint, filed July 11, 1980, alleged that Claybridge had then entered into a charter with the Ministry whereby Claybridge had agreed to transport a cargo of wheat from a port in the Gulf of Mexico to Alexandria or Port Said, Egypt; that pursuant to this some 48,000 metric tons of wheat were loaded on board the Ulysses on or about April 22, 1979, in good order and condition and bills of lading were issued to the Ministry therefor; but that, when the vessel arrived at Port Said, the cargo was delivered "short or otherwise damaged" to the extent of $2,200,000. Plaintiffs demanded arbitration.[1]
 
 
 4
 Some six months later, on January 5, 1981, Babanaft moved, under F.R.Civ.P. 24(a) and (b), for leave to intervene as a plaintiff against Universe and the Ulysses. The complaint annexed to the motion alleged, in addition to the facts heretofore stated, that after the Ulysses had reached Port Said and had commenced discharge of her cargo, it was discovered that heavy metal rust scale identified as originating from the tops and sides of the cargo compartments of the Ulysses had become intermixed with the grain; that this caused the Egyptian consignees and port officials to halt the discharge until September 23, 1979, so that discharge was not completed until October 17, 1979, when the balance of the cargo was accepted by the Egyptian consignee; and that during the prolonged period of discharge Babanaft paid charter hire and incurred the cost of bunker fuel oil and related items and lost the use of the ship under the time charter. Babanaft estimated damages in the amount of $2,500,000; it also demanded arbitration.
 
 
 5
 After opposing affidavits had been filed on behalf of Universe, the Ulysses, and the plaintiffs, largely on the ground that Babanaft was already secured by bond on any claim that it had against Universe and the ship, counsel for Babanaft filed a reply affidavit. This alleged that it had now become apparent, as previously it had not been, that defendants did not concede responsibility for the condition of the Ulysses and the consequences alleged by the plaintiffs. Babanaft now anticipated that the defendant ship owner would assert a counterclaim to the effect that plaintiffs could have arranged to discharge the cargo without 81 days of delay (from July 5 to September 23, 1979) and thereby to minimize the loss. Babanaft therefore annexed to its reply affidavit an amended complaint which included, in addition to the claims against Universe and the Ulysses, a cross-claim against plaintiffs alleging that they had wrongfully halted the discharge at Port Said and thus wrongfully denied Babanaft its rightful use of the vessel under Babanaft's time charter with Universe. Babanaft now sought intervention both as a plaintiff against Universe and the Ulysses and as a cross-claimant against the plaintiffs. After plaintiffs submitted a rebuttal affidavit which raised, inter alia, a claim of sovereign immunity, the judge made an endorsement dated April 1, 1981, on Babanaft's motion for intervention:
 
 
 6
 Permissive intervention is granted. The action is stayed as to intervenor vis-a-vis Universe Tankships, Inc., and the M/S Ulysses pending arbitration. Plaintiffs shall raise by motion all matters presently asserted going to dismissal or other limitation as a matter of law.
 
 
 7
 Plaintiffs accepted the invitation by moving for an order dismissing the cross-claim upon the grounds of:
 
 
 8
 (a) lack of subject matter jurisdiction, pursuant to F.R.Civ.P. 12(b)(1), 28 U.S.C. Sec. 1330(a), and 28 U.S.C. Sec. 1604 (sovereign immunity) [and]
 
 
 9
 (b) failure to state a claim upon which relief can be granted, pursuant to F.R.Civ.P. 12(b)(6).
 
 
 10
 The Egyptian Ambassador submitted a letter invoking sovereign immunity on behalf of the plaintiffs with respect to Babanaft's cross-claim.
 
 
 11
 In an opinion and order filed December 14, 1982, the district judge recognized that "efficiency obviously would be served by trying all the issues arising out of this general nucleus of facts in one action rather than requiring Babanaft to bring an action in the courts of Egypt", as a subsequent development has made even plainer, see fn. 4. He went on to state, however, "sovereign immunity is a bar here absent Babanaft's assertion of a valid exception." The judge first considered the exception to immunity provided in the third clause of 28 U.S.C. Sec. 1605(a)(2), to wit, any case in which the action is based:
 
 
 12
 upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States
 
 
 13
 and concluded that the unduly long time allegedly taken by plaintiffs to discharge the Ulysses at Port Said had no "direct effect" in this country. He then turned to Babanaft's contention that an exception was afforded by the provision in Sec. 1607(b) entitled "Counterclaims" which withdraws sovereign immunity with respect to any counterclaim "arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state". Acknowledging that "this argument has some appeal", he nonetheless ruled that Sec. 1607(b) applies only to counterclaims and not to cross-claims. He concluded that Babanaft's cross-claim was barred on the ground of sovereign immunity and, on January 7, 1983, entered an order which provided that final judgment be entered dismissing all claims of Babanaft against plaintiffs pursuant to F.R.Civ.P. 54(b). Babanaft has appealed.
 
 
 14
 We have no quarrel with the reasoning of the district court so far as it went. The trouble is that it did not go far enough. It failed to take account of the exception in the first clause of 28 U.S.C. Sec. 1605(a)(2) withdrawing sovereign immunity in any case
 
 
 15
 in which the action is based upon a commercial activity carried on in the United States by the foreign state.
 
 
 16
 This language must be read in light of the definition in 28 U.S.C. Sec. 1603(d) and (e):
 
 
 17
 (d) A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.
 
 
 18
 (e) A "commercial activity carried on in the United States by a foreign state" means commercial activity carried on by such state and having substantial contact with the United States.
 
 
 19
 When a foreign state has carried on a commercial activity within the United States, the first clause of Sec. 1605(a)(2) thus withdraws immunity with respect to claims based not only on acts within the United States but also with respect to acts outside the United States if they comprise an integral part of the state's "regular course of commercial conduct" or "particular commercial transaction" "having substantial contact with the United States." The third clause of Sec. 1605(a)(2), discussed by the district judge, was included so as to withdraw immunity with respect to certain acts outside the United States in connection with a commercial activity as to which immunity had not already been withdrawn by the first clause. Babanaft's claim is "based upon" plaintiffs' entire course of activity in arranging in the United States for the purchase of the wheat and its transportation to Egypt, not simply on the acts done (or not done) by plaintiffs in the course of unloading at Port Said. See Gemini Shipping, supra, 647 F.2d at 319; Matter of Rio Grande Transport, Inc., 516 F.Supp. 1155, 1161-62 (S.D.N.Y.1981); Gibbons v. Udaras na Gaeltachta, 549 F.Supp. 1094, 1108-09 n. 5 (S.D.N.Y.1982).
 
 
 20
 As noted in Gemini Shipping, supra, 647 F.2d at 319, the House Judiciary Committee's report[2] accompanying the bill that became FSIA lists "import-export transactions involving sales to, or purchases from, concerns in the United States" as conduct within the contemplation of the first clause of Sec. 1605(a)(2) and states that the "substantial contact" standard of Sec. 1603(e) can be met by as little activity as "receiv[ing] financing from a private or public lending institution located in the United States", such as that furnished by the P.L. 480 program.[3] House Report No. 1487, 94th Cong., 2d Sess. 17 (1976), reprinted in 1976 U.S.Code Cong. & Ad.News 6604, 6615-16. As indicated above, the "course of commercial conduct" engaged in by the plaintiffs in the United States encompassed not just the purchase of the wheat but also plaintiffs' arrangement for its carriage to Egypt. The wheat was carried from a United States port on a vessel chartered by plaintiffs, under bills of lading executed by the master pursuant to the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. Sec. 1300 et seq., which named one of the plaintiffs, the General Authority for Supply Commodities, as consignee. Section 1301(e) of COGSA defines "carriage of goods" as covering "the period from the time when the goods are loaded on to the time when they are discharged from the ship." Although the charters from Babanaft to Claybridge and from Claybridge to the Ministry are not in the record, these almost certainly included clauses requiring timely discharge and providing for "contract demurrage" at a specified rate per day for a specified period, see, e.g., Uniform General Charter of Baltic and White Sea Conference (GENCO), set out in Gilmore & Black, The Law of Admiralty 998-99 (2d ed. 1975). After the expiration of the period of contract demurrage, the charterer is liable for "non-contract demurrage", in reality unliquidated damages for delay, id. at 212. We held in Gemini Shipping, supra, 647 F.2d at 319-20, that the first clause of Sec. 1605(a)(2) withdrew immunity from a foreign state with respect to a claim on a guarantee, expressed in a telex sent from Syria, of demurrage owing from a charterer, Itrask, which was in the same position toward the plaintiff in that case as Claybridge is toward Babanaft here. We see no principled basis for distinguishing, from the standpoint of sovereign immunity under FSIA, between a claim based on such a guarantee and a claim for a breach of the duty promptly to discharge the ship. Plaintiffs assert that they owed no such duty to Babanaft since they were in privity only with Claybridge and that Babanaft's claim thus sounds in tort rather than contract. This alone is immaterial, see Sugarman v. Aeromexico, Inc., 626 F.2d 270, 272 (3 Cir.1980). The question whether, if voyage charterer A breaches his contractual duty of prompt discharge to voyage charterer B and thereby causes a delay in the latter's redelivery of the ship to time charterer C, A is liable to C goes to the merits rather than to sovereign immunity.[4] We do not pass on it beyond quoting the statement in Gilmore & Black, supra, at 210-11 that:
 
 
 21
 [The] time [for loading and unloading] is always of direct and vital financial significance to the owner [here the time charterer], since his income from the vessel depends on the dispatch with which she can complete each charter, and since, moreover, he needs to be able to predict with some accuracy when she will be free again, so as to be able to arrange another fixture.
 
 
 22
 We also regard as irrelevant the Ministry's contention that blame for the delay in discharge rested not upon it but upon the defendants; this also goes to the merits rather than to sovereign immunity.[5] It follows from all of the above that, since Babanaft's claim against plaintiffs clearly arises, under the test set forth in F.R.Civ.P. 13(g), from the same transaction or occurrence that is the subject matter of plaintiffs' action, it should not have been dismissed on the ground of sovereign immunity--unless FSIA's explicit provision in Sec. 1607 for counterclaims impliedly forecloses the application of Sec. 1605 to cross-claims, a subject to which we now turn.[6]
 
 
 23
 Section 1607 of FSIA, which we quote in full in the margin,[7] like the Act as a whole, was intended to reduce, not to enlarge, the scope of sovereign immunity. It withdraws immunity not only in a situation, such as we have held to be the case here, where the foreign state would not be entitled to immunity under Sec. 1605 if such a claim had been brought in a separate action against it, but in the two other situations described in Sec. 1607(b) and (c). The plaintiffs' contention is that Sec. 1607, by specifying counterclaims against foreign states entering our courts as plaintiffs by the defendants named in the complaints, was meant to exclude cross-claims from its terms, and further that Congress by thus making a separate exception for counterclaims meant to limit the other FSIA exceptions in Secs. 1605 and 1606 to claims brought in separate actions against a foreign sovereign, thereby leaving sovereign immunity a bar to cross-claims of every stripe. We accept the first proposition, but the second does not follow from it.
 
 
 24
 The findings and declarations of purpose in Sec. 1602 of FSIA recite that:
 
 
 25
 Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned ...
 
 
 26
 The House Report states the first of four objectives to be attained by the bill to be as follows:
 
 
 27
 [T]he bill would codify the so-called "restrictive" principle of sovereign immunity, as presently recognized in international law. Under this principle, the immunity of a foreign state is "restricted" to suits involving a foreign state's public acts (jure imperii) and does not extend to suits based on its commercial or private acts (jure gestionis). This principle was adopted by the Department of State in 1952 and had been followed by the courts and by the executive branch ever since. Moreover, it is regularly applied against the United States in suits against the U.S. Government in foreign courts.
 
 
 28
 House Report No. 1487, supra, at 7, reprinted in 1976 U.S.Code Cong. & Ad.News at 6605. The language of Sec. 1605(a)(2) is broad enough to include a cross-claim, and we can think of no good reason why Congress should have wished to preserve sovereign immunity when a foreign state's commercial activity is the subject of a cross-claim authorized by F.R.Civ.P. 13(g), while withdrawing that immunity when the foreign state is a defendant or a plaintiff against which a counterclaim is brought. Congress' effecting an even broader repeal of sovereign immunity with respect to counterclaims by enacting Sec. 1607(b) and (c) does not indicate an intention to allow an unrestricted assertion of sovereign immunity with respect to cross-claims. It is true that reading Sec. 1605 to apply to any sort of claim within its language which may be permissibly asserted in an action renders Sec. 1607(a) redundant. A sufficient explanation is that, having decided on an even broader restriction of sovereign immunity with respect to counterclaims than with respect to claims, Congress wished to deal comprehensively with counterclaims in Sec. 1607 rather than, by omitting subsection (a), to create a doubt whether Sec. 1605 applied to a counterclaim of the sort there described. Nothing in the legislative history indicates otherwise.
 
 
 29
 The Ministry contends, however, that we have decided to the contrary in Kunstsammlungen zu Weimar v. Elicofon, 678 F.2d 1150, 1160 (2 Cir.1982). This was an action instituted by the Federal Republic of Germany and carried on by the Kuntsammlungen (KZW), as representative of the German Democratic Republic (GDR). Defendant Elicofon was an American who had innocently purchased two stolen Durer portraits, title to which had allegedly passed by various transactions to KZW. One link in the chain of title was a 1921 agreement between the Grand Duke of Saxony-Weimar and the Territory of Weimar, whereby the art collections of the Duke and his family displayed in public museums, including the two portraits, would become the property of the Territory upon the extinction of the male line. His daughter-in-law the Grand Duchess was allowed to intervene as a plaintiff. She asserted two claims. One, against Elicofon, was that, for a variety of reasons found to be without merit, title to the portraits had remained in the Grand Ducal family. The other, against KZW, related to the failure of the successor to the Territory of Weimar to pay annuities stipulated for in the 1921 agreement. After holding that the second claim was barred by the act of state doctrine, the court added, 678 F.2d at 1160:
 
 
 30
 Furthermore, her cross-claim is barred by the Foreign Sovereign Immunities Act, whose exception for counterclaims does not apply. 28 U.S.C. Sec. 1607(b). Thus it becomes unnecessary for us to decide whether her claim is also barred by Rule 13, F.R.Civ.P.
 
 
 31
 We fail to see how this language supports the conclusion that the Ministry would have us draw from it. Unlike Babanaft's claim against the Ministry, the Grand Duchess' claim against KZW was not one for which immunity had been withdrawn by any provision of Sec. 1605. Beyond this it would have been pressing rather hard to say that the claim arose "out of the transaction or occurrence that is the subject matter of the claim of the foreign state" for purposes of the Sec. 1607(b) exception since the 1921 agreement did not condition the Territory's title to the art collection on the continued payment of annuities, the latter being intended to cover the Grand Duke's "civil lists, maintenance, and other gratuities," 678 F.2d at 1159. Rather than grappling with that question and the corresponding one under F.R.Civ.P. 12(g), the court took the sufficient route of pointing out that the only exception in FSIA offering the Grand Duchess any hope was the "arising out of the transaction or occurrence" language found only in Sec. 1607(b), a section applicable solely to counterclaims. We see nothing to indicate that the court intended to say that Sec. 1605's "[g]eneral exceptions to the jurisdictional immunity of a foreign state" had no application to any cross-claim whatsoever,[8] a question which the case did not raise at all. The Grand Duchess' annuity claim did not come within any of Sec. 1605's exceptions; Babanaft's does.
 
 
 32
 The order dismissing the cross-claim against the plaintiffs is reversed, with directions for reinstatement. It goes without saying that we have not passed on the merits of the cross-claim or of any defenses or objections that may be asserted with respect to it other than those ruled on in this opinion.
 
 
 
 [1]
 Apparently it has not been possible to serve process on Claybridge. The Ulysses has submitted to arbitration with Babanaft but denies the jurisdiction of the district court over it in the action brought by the Ministry
 
 
 [2]
 The Report of the Senate Judiciary Committee was identical. Senate Report No. 1310, 94th Cong., 2d Sess. 8-9 (1976)
 
 
 [3]
 The Gemini Shipping opinion also referred to testimony of Michael M. Cohen, Chairman, Committee on Maritime Legislation, Maritime Law Association of the United States, at Hearings on H.R. 11315 Before the Subcommittee on Administrative Law and Governmental Relations of the House Committee on the Judiciary, 94th Cong., 2d Sess. 96 (1976), that P.L. 480 sales were one of the targets of the bill. 647 F.2d at 319-20
 
 
 [4]
 In an answer to plaintiffs' complaint filed March 8, 1983, Universe has made a counterclaim against plaintiffs asserting that "[p]laintiffs by virtue of their alleged ownership of the cargo were under an affirmative duty to accept tender of the cargo from the S.S. Ulysses" and seeks to hold plaintiffs liable for any damages that may be awarded to Babanaft in the pending arbitration between Babanaft and Universe. The answer also denied plaintiffs' assertion of an agreement to arbitrate. The Ministry's reply to Universe's counterclaim asserts, inter alia, that Sec. 1607 does not apply to the counterclaim and thus it is barred by sovereign immunity
 
 
 [5]
 It may turn out that blame does not attach solely to one party
 Any res judicata effect of the award entered by a court of first instance at Port Said on November 19, 1979, a copy of which is attached to appellees' brief, likewise would go to the merits and not to sovereign immunity.
 
 
 [6]
 Plaintiffs argued in their brief in this court that dismissal of the cross-claim was required by Verlinden B.V. v. Central Bank of Nigeria, supra, 647 F.2d at 325, since the cross-claim is between two aliens--a foreign corporation and a foreign government, and is thus allegedly beyond the jurisdiction which Congress can confer under Article III of the Constitution. A sufficient answer is that in this case subject-matter jurisdiction of the action did not have to be based solely on 28 U.S.C. Sec. 1330(a), as the court held to be true in Verlinden, but rested comfortably on the grant, made both in Article III and in 28 U.S.C. Sec. 1333, of admiralty and maritime jurisdiction. This includes claims between aliens. See The Belgenland, 114 U.S. 355, 368-69, 5 S.Ct. 860, 866-867, 29 L.Ed. 152 (1885). Although there was no need for an independent jurisdictional basis of the cross-claim, see 3 Moore's Federal Practice p 13.36 at 13-219 to 13-220 (2d ed. 1983) and cases there cited; Wright, The Law of Federal Courts 539 (4th ed. 1983), this too was within the constitutional and statutory grants of admiralty and maritime jurisdiction.7 Sec. 1607. Counterclaims
 In any action brought by a foreign state, or in which a foreign state intervenes, in a court of the United States or of a State, the foreign state shall not be accorded immunity with respect to any counterclaim--
 (a) for which a foreign state would not be entitled to immunity under section 1605 of this chapter had such claim been brought in a separate action against the foreign state; or
 (b) arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state; or
 (c) to the extent that the counterclaim does not seek relief exceeding in amount or differing in kind from that sought by the foreign state.
 
 
 [8]
 Judge Owen did not so hold. His reference to Sec. 1607 was made necessary by his conclusion, with which we have disagreed, that Babanaft had not brought itself within Sec. 1605(a)(2)