**TIFA LIMITED, Plaintiff,**

v.

**REPUBLIC OF GHANA, et
al., Defendants.**

Civ. A. No. 87–446.

United States District Court,
D. New Jersey.

May 13, 1988.

**394**

Kevin Kovacs, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, N.J., for plaintiff.

Frank M. Gregorek, Wolf, Haldenstein, Adler, Freeman & Herz, New York City and Chasan, Leyner, Tarrant & D'Italia, Jersey City, N.J., for defendants Republic of Ghana, Ministry of Agriculture of Ghana, Ministry of Health of Ghana, Supreme Military Council of Ghana, Ghana Cocoa Marketing Bd., Social Sec. Bank, Ghana Embassy, U.S.A., and Baah–Boakye.

## OPINION

LECHNER, District Judge.

This is a commercial dispute in which the plaintiff Tifa Limited ("Tifa") brings an action against the Republic of Ghana and other defendants. Defendants Republic of Ghana ("Ghana"), Ministry of Agriculture of Ghana ("Ministry of Agriculture"), Ministry of Health of Ghana ("Ministry of Health"), the Supreme Military Council of Ghana ("SMC"), the Ghana Cocoa Marketing Board ("GCMB"), the Social Security Bank Limited ("SSB"), the Embassy of the Republic of Ghana to the United States of America (the "Embassy"), and Kwasi Baah–Boakye ("Baah–Boakye") (collectively referred to as the "governmental defendants") bring this motion under Fed.R.Civ.P. 12(b). The governmental defendants seek to dismiss or transfer this action on the following grounds: (1) lack of subject matter jurisdiction; (2) lack of personal jurisdiction; (3) improper venue; and (4) forum non conveniens. For the following reasons, this action is transferred to the United States District Court for the District of Columbia.

*Facts*

Tifa is a New Jersey corporation with its principal place of business in Millington, New Jersey. (Amended Complaint, Parties, ¶ 1.) Tifa apparently sells pesticides and related equipment worldwide. (*Id.*) Tifa's managing director is Arnold M. Livingston ("Livingston"). (*Id.*, First Count, ¶ 1.)

Ghana is a sovereign nation which achieved its independence in 1957. (*Id.* at ¶ 2; Affidavit of Eric Kwamina Otoo ("Otoo Aff."), ¶ 3.) From January, 1972 to July 1978, General Ignatius K. Acheampong ("General Acheampong") was the head of Ghana. (Certification of Arnold M. Livingston ("Livingston Cert."), ¶ 18 and Exh. 12.) SMC was the executive and legislative body of Ghana from October, 1975 to June, 1979. (*Id.* at ¶ 6.)

The Ministry of Agriculture is a cabinet level department of the Ghanaian Government which functions to further the agricultural development and planning goals of Ghana. (Otoo Aff., ¶ 4.) The Ministry of Health is a cabinet level department of the Ghanaian government which serves to fur-

ther the health planning goals of Ghana. (*Id.* at ¶ 5.) The GCMB is an agency of the Ministry of Trade of Ghana which is a cabinet level department of the Ghanaian government. (*Id.* at ¶ 7.) The primary function of the GCMB is to regulate trade in cocoa. (*Id.*) The SSB is a public corporate body wholly owned by the Social Security and National Insurance Trust, a Ghanaian institution charged with the management and administration of social security funds for the employees of Ghana. (*Id.* at ¶ 8.) The Embassy is the official representative of Ghana to the United States and is located in Washington, D.C. (*Id.* at ¶ 9.) Kwasi Baah–Boakye was the first secretary of the Embassy from June, 1984 to December, 1985.

Defendant Sunrise International Services, Ltd. ("Sunrise") was a corporation organized under the laws of Ghana with its principal place of business in Ghana. (Amended Complaint Parties, ¶ 10.) Defendant Duncan Ozdor ("Ozdor") was the managing director of Sunrise. (*Id.* at ¶ 11.) Defendant DHL Consultancy Services, Ltd. ("DHL") was a consulting company retained by Sunrise and Tifa. DHL's principal place of business was in Ghana and defendant Harry Amos Dodoo ("Dodoo") was the director of DHL. (*Id.* at ¶¶ 12–13.) Defendant Daniel Ashitey ("Ashitey") was a consultant for Sunrise and Tifa. (*Id.* at ¶ 14.) Defendants Sunrise, Ozdor, DHL, Dodoo and Ashitey are not parties to the instant motion.

In late December, 1976, Livingston was contacted at his New Jersey office by Frank Howard ("Howard"), a businessman apparently acting on behalf of certain Ghanaian individuals. In December, 1976 Livingston met in New York City with Howard, Ozdor and Benito Simpson Akatto ("Akatto") (the "New York meeting"). According to Livingston, the three men identified themselves as representatives of Ghana with a mandate from General Acheampong, the Head of Ghana, to contract for a pesticide project in Ghana (Amended Complaint, First Count, ¶ 1; Livingston Cert.,

¶¶ 2–3). The present government of Ghana contradicts Tifa's assertion that Howard, Ozdor, and Akatto acted with a mandate from the head of state of Ghana.[1] According to the present government, at no time has any individual or entity been authorized to represent Ghana or its agencies or instrumentalities on visits to the United States regarding the pesticide project. (Otoo Aff., ¶ 12.)

Tifa alleges that according to Howard, Ozdor and Akatto, the proposed pesticide project involved a national campaign to eradicate mosquitos, control birds at airports, spray for agricultural pests, and import pesticides for farm use in Ghana. (Amended Complaint, First Count, ¶ 2.) The three businessmen further stated, according to Tifa, that funding for the project would be through a five year irrevocable letter of credit with five equal annual payments guaranteed by Ghana. (*Id.*)

In January, 1977 Tifa apparently prepared a proposal in accordance with the outline set forth in the New York meeting. The proposal provided for two alternative means of payment by Ghana: either (1) an independent source would loan the money to Ghana or (2) Tifa would finance the project on the condition that: (a) an irrevocable letter of credit for the full value of the five-year program was made available to Tifa; (b) the letter of credit provided for five equal annual payments; (c) the letter of credit was guaranteed by the Central Bank of Ghana; and (d) Ghana provided an import license to Tifa that would exempt imports from duties. (Amended Complaint, First Count at ¶ 3.) Livingston states he addressed the proposal to General Acheampong and forwarded it to Howard for transmission to General Acheampong in Ghana. (Livingston Cert., ¶ 4.)

According to Tifa, in March, 1977, Howard, Ozdor and Akatto met with Livingston in New Jersey and informed Livingston that General Acheampong was impressed with the proposal for the pesticide

---

1. The present government of Ghana is not headed by Acheampong. Acheampong was apparently executed when the present government seized power. (*See* discussion, *infra;* Livingston Cert. ¶ 19 and Exhs. 12–13.)

project and had no objection to the funding arrangement involving Tifa. (Amended Complaint, First Count, ¶ 3; Livingston Cert. at ¶ 5). On March 15, 1977, Tifa promised to pay Howard, Ozdor and Akatto a fifteen percent commission on all funds received as a result of their efforts to reach an agreement with Ghana. (Amended Complaint, First Count, ¶ 5.)

Livingston states that in March, 1977 he was invited by General Acheampong through Ozdor to meet in Ghana with General Acheampong. During that same month Livingston states he met with various government officials in Ghana, including General Acheampong, to discuss the spraying project. (Amended Complaint, First Count, ¶ 7; Livingston Cert. ¶¶ 7–8). Tifa alleges that in reliance on these meetings with Ghanaian officials in Ghana, it contracted with Sunrise in March of 1977 to supply equipment and goods for the pesticide project. (*Id.* at ¶ 8.) The alleged Tifa–Sunrise contract provided all costs for chemicals, equipment and the costs of Tifa personnel would be submitted to the government of Ghana for payment. (Livingston Cert. Exh. 3.) Sunrise was to provide local personnel, facilities and other needed items for the project. (Livingston Cert., ¶ 9, Exh. 3.)

On May 2, 1977, Livingston received a letter at his New Jersey office from the Ministry of Agriculture thanking him for the information he had provided about Tifa's spraying equipment and expressing the hope that Tifa would have the opportunity to participate in the spraying of crops against pests, diseases and weeds. (Livingston Cert., Exh. 5.) In June, 1977 representatives of the Ministry of Health, the Ministry of Agriculture, the SMC, Tifa and Sunrise met in Ghana to further discuss the spraying project. (Amended Complaint, First Count, ¶ 13). Recorded in the minutes of this meeting [2] is the following introductory statement by the Commissioner of Health of Ghana: "[T]he project in hand is a joint venture between the government of Ghana on one hand and Tifa USA Ltd./Sunrise Industrial (Ghana) Ltd. on the other.... [T]he Ministries of Agriculture and Health will hold Government's shares in the joint venture." (*See* Livingston Cert., ¶ 12 and Exh. 6).

In May, 1978 Colonel Akompi of the SMC ("Colonel Akompi") apparently wrote to the Governor of the Bank of Ghana directing him to waive the mandatory cash margin for the importation by Sunrise of all "spraying machines and related chemicals." (Livingston Cert., Exh. 7; Amended Complaint, First Count, ¶ 18.) Akompi stated the chemicals were "intended for the Ministries of Agriculture and Health." (*Id.*)

In June, 1978 the Ministry of Finance allegedly approved the issuance of the necessary import license for the pesticide project to be conducted by Tifa and Sunrise. (Amended Complaint, First Count, ¶ 21.) In a letter, dated July 7, 1978, Colonel Akompi wrote to Livingston in New Jersey informing him the import license was issued good through December 31, 1978 and requesting Tifa to "send the items as a matter of urgency." (*Id.* at ¶ 21; Livingston Cert., ¶ 13 and Ex. 9.)

In July, 1978 General Acheampong's subordinate, Lt. Gen. Akuffo ("Lt. Gen. Akuffo"), apparently replaced Acheampong as the head of state in Ghana. (Livingston Cert., ¶ 18 and Ex. 1.) In an unrelated event beginning around this time Tifa alleges it provided Odzor with three advance payments in the amount of $10,000 each for use in financing local operations in Ghana. These payments were allegedly made in July and September, 1978 and later in February, 1979. (Amended Complaint, Tenth Count, ¶ 2.)

Allegedly in reliance on the July 7, 1978 letter from Colonel Akompi and various other communications from government officials in Ghana, Tifa shipped the goods and equipment to Ghana in September and December of 1978. The goods were allegedly shipped at a price of $2,309,475.64. The September shipment was payable by Sunrise in two equal installments of $761,-062.82. (Livingston Cert., ¶ 14; Amended

---

**2.** The minutes were recorded by Capt. N.C. Coleman, Secretary to the Ghana Ministry of Health.

Complaint, First Count, ¶ 23.) The first payment was payable on April 10, 1979 and the second payment was due on September 10, 1979. According to Tifa, the price of the December, 1978 shipment was $787,-350.00 payable to Sunrise, half in 180 days and half in 360 days. (Amended Complaint, First Count. ¶ 25.) Sunrise was to have been paid by the SSB upon presentation of the government contracts to the SSB in Ghana. (Amended Complaint, First Count, ¶ 23.) Sunrise would then apparently pay Tifa.

The goods and equipment were assembled in New Jersey and shipped from New Jersey to Ghana. (Livingston Cert., ¶ 14.) By letter, dated November 15, 1978, the SSB forwarded to Tifa's bank in the United States copies of two "accepted drafts" for $761,062.78 each. (Id. at Exh. 10.)

After the arrival of the goods in Ghana, Tifa allegedly sent engineering personnel to Ghana to assist in setting up the equipment and training Ghanaians to use the goods. (Livingston Cert., ¶ 15.) Livingston personally visited Ghana at this time to coordinate the commencement of the program and training of the personnel. (Id.) Livingston states he held numerous meetings in Ghana with government officials who promised to make timely payments. (Id.) A Ghanaian newspaper, dated February 22, 1979, reported the government was undertaking a mass spraying of the entire country. The newspaper indicated the spraying project was a joint venture between Ghana and Tifa. (Id. at Ex. 11.)

The first of the two payments on the original shipment due to Tifa on April 10, 1979 was not paid. Livingston states he began to inquire in April, 1979 as to the status of the payment and the reason for delay. (Livingston Cert., ¶ 17.)

In early June, 1979 the New Armed Forces Revolutionary Council, led by Flight Lieutenant Jerry J. Rawlings, overthrew the Ghanaian military regime in a coup. (Id. at ¶ 19.) Shortly therafter, both General Acheampong and Lt. Gen. Akuffo were executed. (Id.) General Acheampong was apparently executed after being convicted of squandering government funds. (Livingston Cert., Ex. 12.)

Following the coup all telephone, cable and mail communications with Ghana became difficult for several months. (Id. at ¶ 20.) Sunrise informed Tifa the goods and equipment were being guarded by the new regime. (Id. at ¶ 20 and Ex. 15.)

After the events in Ghana calmed, Livingston renewed his efforts to collect the payments due and get the pesticide project started. Livingston alleges he was not successful because Sunrise was no longer cooperative and his contacts with the government were no longer extant. (Id.)

According to newspaper reports and individuals visiting Ghana, the Ministry of Health began, in February, 1981, a nationwide spraying project using Tifa supplied goods and equipment. (See id. at ¶ 22 and Exhs. 17–19.) Tifa alleges it neither participated in the spraying project nor was it paid for the goods and equipment. (Id. at ¶ 23.) Livingston alleges he has not returned to Ghana since the June 1979 coup because his life has been threatened if he returns. (Id.) Tifa apparently pursued its claim against Ghana through the United States Department of Commerce in 1982 but was unsuccessful. (Livingston Cert. at ¶ 24.) In 1983 Tifa indirectly assisted Akatto in collection efforts in Ghana against Sunrise and Ozdor. (Id.)

Livingston states he was contacted, in the Fall of 1984, by Baah–Boakye who told Livingston the government of Ghana was conducting an investigation into the pesticide project with Tifa. (Id. at ¶ 25.) Livingston states he first met with Baah–Boakye in New Jersey at the office of local counsel for Akatto and Howard. (Id.) According to Livingston, Baah–Boakye later came to Tifa's New Jersey offices to review documents. During these meetings Livingston avers Baah–Boakye assured him if the government of Ghana had been involved in the transaction at issue, it would pay Tifa. (Id.) Livingston alleges Baah–Boakye also warned Livingston not to take further legal action because it might jeopardize the investigation. (Id.)

Baah–Boakye, however, contradicts Livingston's assertions. Baah–Boakye avers he met only once with Livingston, on October 16, 1984, at an unspecified location, in order to gather information on the relationship between Tifa and Odzor in conjunction with an investigation by Ghana into the finances of Ozdor. (Affidavit of Kwasi Baah–Boakye, ¶ 2.) Baah–Boakye avers his only other communications with Livingston were two brief telephone calls regarding their meeting and the investigation of Odzor. (*Id.* at ¶ 3.) According to Baah–Boakye, at none of these times did Livingston claim Ghana was responsible for the transaction nor did Baah–Boakye indicate or suggest Tifa should refrain from exercising any option it might have against any party. (*Id.* at ¶ 4.)

On February 4, 1987 Tifa filed a complaint in this court. On August 11, 1987, Tifa filed an amended complaint alleging subject matter jurisdiction under 28 U.S.C. § 1330(a); 28 U.S.C. § 1332(a)(2)–1332(a)(4); and 28 U.S.C. § 1602 *et seq.* (the "Foreign Sovereign Immunities Act" or "FSIA"). In the first count of the amended complaint Tifa alleges Ghana and its various ministries have breached their express promise to participate in the pesticide project as a joint venture. In addition, Tifa alleges defendant SSB has breached its express promise to pay Tifa through Sunrise.

In the second count Tifa alleges Ghana and its various ministries have breached an implied promise to pay Tifa the reasonable value of the equipment and chemicals shipped to Ghana by Tifa. In the sixth count Tifa alleges reliance on the asserted false assurances and misrepresentations of defendant SSB that Tifa would be paid. In the seventh count Tifa seeks damages against Ghana, its various ministries, the GCMB and Sunrise under the doctrines of quasi contract or quantum meruit.

In the eighth count Tifa seeks damages against Ghana, its various ministries, Sunrise, Odzor, DHL, Dodoo and Ashity for misrepresentation and fraud. In the ninth

count Tifa seeks damages for misrepresentation and fraud against the Ghana Embassy and Baah–Boakye.[3] In all counts Tifa seeks damages in the amount of $2,309,-475.64 plus interest, costs and fees. Tifa seeks punitive damages only in the eighth count.

## I. *Discussion*

■ A district court is powerless to transfer a case unless the court has subject matter jurisdiction over the action. *See Atlantic Ship Rigging Co. v. McLellan,* 288 F.2d 589 (3d Cir.1961). Subject matter jurisdiction is "fundamentally preliminary" to both the issues of personal jurisdiction and venue. *See Leroy v. Great Western United Corp.,* 443 U.S. 173, 180, 99 S.Ct. 2710, 2714, 61 L.Ed.2d 464 (1979). Thus, the issue of venue cannot be decided prior to a determination that the court has subject matter jurisdiction over the action.

The blanket denial by the present government of Ghana that no individual or entity has been authorized to act as Ghana's agent in the United States is not dispositive. (*See* Otoo Aff., ¶ 12.) Therefore, for the purposes of this motion the allegations in Tifa's amended complaint are taken as true. *See Gemini Shipping v. Foreign Trade Organization,* 647 F.2d 317, 319 (2d Cir.1981). The parties conceded this at oral argument.

### A. Subject Matter Jurisdiction

28 U.S.C. § 1330(a) confers subject matter jurisdiction on federal district courts over any claim against a foreign state "not entitled to immunity ... under sections 1605–1607 of this title." 28 U.S.C. § 1604 provides generally that "a foreign state shall be immune from the jurisdiction of the courts of the United States." Section 1605 then sets forth the commercial activity exception to sovereign immunity which reads as follows:

A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case ... in

---

**3.** The third, fourth, fifth and tenth counts are not relevant to the governmental defendants'

motion presently before the court.

which [1] the action is based upon a commercial activity carried on in the United States by a foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

The Third Circuit has noted,

The overriding congressional purpose behind the FSIA was to codify the principle of international law known as "restrictive" sovereign immunity. Adopted officially by the Department of State in 1952, this principle "restricts" the situations in which foreign states may claim immunity from judicial action to those concerning public, or sovereign acts (*jure imperii*). Immunity is not extended, under this doctrine, to suits based on commercial, or private acts (*jure gestionis*). Consequently, the presence of commercial activity is the crucial component of the FSIA sections detailing when a foreign sovereign may not invoke immunity.

*Velidor v. L/P/G Benghazi,* 653 F.2d 812, 817 (3d Cir.1981), *cert. dismissed,* 455 U.S. 929, 102 S.Ct. 1297, 71 L.Ed.2d 474 (1982) (citation omitted).

1. Definition of Foreign State Under the FSIA

A preliminary question in the case at bar is whether the defendants involved in this motion are foreign states within the meaning of the FSIA. The FSIA defines a foreign state as follows:

(a) A "foreign state" ... includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

(b) An "agency or instrumentality of a foreign state" means any entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States ... nor created under the laws of any third country.

28 U.S.C. § 1604.

■ Tifa avers the present government of Ghana is not a "foreign state" and therefore the governmental defendants cannot establish immunity under the FSIA. (Plaintiffs' Memorandum ("PM"), pp. 23–27.) Tifa contends Ghana is not a foreign state because the present government came to power in an illegitimate military coup. (*Id.* at 25.) I decline to inquire into the legitimacy of the current regime because such an inquiry would require this court to make a determination which affects the foreign relations of the United States. *See Republic of Vietnam v. Pfizer, Inc.,* 556 F.2d 892, 894 (8th Cir.1977) ("The recognition of foreign governments is a function of the executive branch and is wholly outside the competence of the judiciary"). Ghana is apparently a sovereign nation having achieved its independence in 1957. (*See* Otoo Aff., ¶ 3.) In fact, Tifa admits in the Amended Complaint that Ghana is a sovereign nation (Parties, ¶ 2); Tifa has treated Ghana as a foreign state during its negotiations for and conduct of the transaction at issue and in this litigation. (*See* Amended Complaint) Tifa also alleges jurisdiction under the FSIA. (*Id.*) Accordingly, I am satisfied Ghana is a foreign state within the meaning of the FSIA. *See Berkovitz v. Islamic Republic of Iran,* 735 F.2d 329, 331 (9th Cir.), *cert. denied,* 469 U.S. 1035, 105 S.Ct. 510, 83 L.Ed.2d 401 (1984) (fact that plaintiffs treated Iran as a foreign state throughout the litigation was a factor in finding the revolutionary government of Iran to be a foreign state).

■ With regard to the ninth count against the Embassy and Baah–Boakye, the FSIA governs only the immunity of foreign states and not the immunity of diplomatic or consular representatives of a foreign state. *See* House Judiciary Committee, Jurisdiction of United States Courts

in Suits Against Foreign States, H.R.Rep. No. 1487, 94th Cong., 2d Sess. 21 reprinted in [1976] U.S.Code Cong. & Admin.News 6604, 6620 ("House Report"). Therefore, the FSIA is not applicable to the claims against the Embassy or Baah–Boakye.[4] The remaining defendants appear to be political subdivisions of Ghana or owned by political subdivisions of Ghana. (*See* Otoo Aff. at ¶¶ 4–10.) They are neither citizens of the United States nor created under the laws of a third country. (*Id.*) Therefore, all of the governmental defendants, except the Embassy and Baah–Boakye, are foreign states for the purposes of the FSIA.[5]

### 2. Commercial Activity

A threshold question in determining subject matter jurisdiction under the FSIA is whether the alleged acts of the foreign state defendants constitute "commercial activity". Section 1603(d) of the Act provides:

> "[C]ommercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

*See also Environmental Tectonics v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052, 1059 (3d Cir.1988).

Beyond the above quoted language the FSIA does not specifically define "commercial". Courts have looked to various sources. Perhaps the best guidance is found in the legislative history of the Act which reads as follows:

> [I]f an activity is customarily carried on for profit, its commercial nature could readily be assumed. At the other end of the spectrum, a single contract, if of the same character as a contract which might be made by a private person, could constitute a "particular transaction or act."

As the definition indicates, the fact that goods or services to be procured through a contract are to be used for a public purpose is irrelevant; ... Thus, a contract by a foreign government to buy provisions or equipment for its armed forces or to construct a government building constitutes a commercial activity. The same would be true of a contract to make repairs on an embassy building. Such contracts should be considered to be commercial contracts, even if their ultimate object is to further a public function.

House Report at 6615.

Restating the legislative history, the Second Circuit has articulated the following test for commercial activity: "[I]f the activity is one in which a private person could engage, it is not entitled to immunity." *Texas Trading v. Federal Republic of Nigeria*, 647 F.2d 300, 310 (2d Cir.1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982).

In *Texas Trading* the government of Nigeria entered into over one hundred contracts to purchase cement for use in the construction of its infrastructure. Four of the contracts were with American corporations. 647 F.2d at 303–04. The government of Nigeria also established related letters of credit. According to the terms of the contracts, each time a supplier loaded a ship and insured its cargo to Nigeria, the supplier could present to a United States bank documents which verified this and receive payment for the amount of cement it had shipped. *Id.* at 304.

When Nigeria realized it had ordered too much cement, it first issued a government regulation requiring the ships to convey to the Port Authority two months before sailing certain information as to their time of arrival. *Id.* at 305. The government next asked the suppliers to stop sending cement. *Id.* Finally, the Nigerian national bank directed the United States bank not to pay

---

**4.** Because this issue has not been fully briefed and additional discovery may be required, any issue as to the immunity of the Embassy and Baah–Boakye can best be dealt with by the transferee court in the District of Columbia.

**5.** I shall refer to these governmental defendants which are defined as foreign states under the FSIA as the "foreign state defendants".

under the letters of credit unless the supplier submitted a document from the Nigerian national bank authorizing payment. *Id.* Applying the above test, the Second Circuit concluded Nigeria's cement contracts and letters of credit constituted commercial activity. *Id.* at 310.

*Texas Trading* illustrates the broad definition of commercial activity which courts have arrived at under the FSIA. *See also Gemini Shipping v. Foreign Trade Organization*, 647 F.2d 317, 319 (2d Cir.1981) (guarantee to pay demurrage made by an organization wholly owned by the Syrian Government which contracted for the shipment of food is commercial activity of a foreign state because the guarantee was part and parcel of a Syrian organization's purchase of food). *Compare Environmental Tectonics*, 847 F.2d at 1059 ("But the award of a major defense contract does not result from a near mechanical exercise of narrowly defined governmental discretion. The award of a military contract, particularly one for a major project, is usually influenced by national security considerations—considerations that are far from routine.")

 In order to undertake an analysis of commercial activity in the case at bar, the conduct of the defendants relevant to an analysis of commercial activity must be identified. Tifa argues the relevant activity for the court's review is Ghana's express or implied promise to pay for goods and equipment used in a nationwide pesticide project. Tifa argues this activity is "commercial activity" under the FSIA. (PM at 28.)

On the other hand, the governmental defendants contend the alleged contract was conditioned on the government of Ghana's exemption of import duties on the shipment and waiver of the cash margin required by the Bank of Ghana. (Defendants' Memorandum ("DM") at p. 10.) Thus, the governmental defendants contend the relevant activity is governmental conduct and thus

the commercial activity exception to the FSIA does not apply. *See DeSanchez v. Banco Central de Nicaragua*, 770 F.2d 1385 (5th Cir.1985) (regulation of sale of foreign exchange is sovereign rather than commercial activity and thus commercial activity exception does not apply); *MOL, Inc. v. Peoples Republic of Bangladesh*, 736 F.2d 1326 (9th Cir.), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984) (Bangladesh government's granting and subsequent revocation of export license to export natural resources is a sovereign act and the commercial activity exception of the FSIA is not applicable to these acts).

Despite the defendants' arguments, the gravamen of Tifa's complaint is the foreign state defendants' alleged breach of the express or implied promise to pay for the chemicals and equipment which Tifa shipped to Ghana. Although standing alone the exemption from import duties and waiver of the mandatory cash margin appear to be governmental activities, these acts were ancillary to the alleged promise. In fact, the proposal could have been agreed to without these acts by Ghana. The proposal contained an alternative provision whereby an independent source would loan money to Ghana instead of Tifa providing financing in exchange for the preferential governmental treatment. (*See* Amended Complaint, First Count, ¶ 3.) Thus, the relevant activity is the foreign state defendants' breach of the alleged promise. This alleged promise was to pay for pesticides and related equipment, the type of activity in which a private person could have engaged; it is not by its very nature governmental as the award of a military contract might well be. *Environmental Tectonics*, 847 F.2d at 1059. Therefore, the conduct of the foreign state defendants is commercial activity under the FSIA.[6] *See Texas Trading*, 647 F.2d at 309.

6. In support of their argument that the alleged acts by Ghana and its ministries was not commercial activity, the governmental defendants cite *International Association of Machinists v. OPEC*, 477 F.Supp. 553, 567 (C.D.Cal.1979),

*aff'd*, 649 F.2d 1354 (9th Cir.1981), *cert. denied*, 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982). In that case the district court held that acts by OPEC countries setting conditions for removal of petroleum from their territory was a

This conclusion is bolstered by the fact that there was ancillary government regulation in the *Texas Trading* and *Gemini Shipping* cases. In *Texas Trading*, the Nigerian government issued orders regulating entry into Nigerian ports and unilaterally altered the letters of credit. 647 F.2d at 305. The Second Circuit did not focus on the ancillary activity by the Nigerian government but rather on the overall nature of the activity which was a commercial contract for cement.

In *Gemini Shipping* an organization wholly owned by the government of Syria purchased rice from a private American corporation. 647 F.2d at 318. Because of problems with the shipment of the rice, a related Syrian government organization guaranteed payment of the demmurage cost to the American corporation which shipped the goods. *Id.* When the Syrian government organization refused to pay the demmurage, the shipping company brought an action in the Southern District of New York against the government organizations. *Id.* at 319.

The court reasoned: "The suit is 'based upon' commercial activity because the guarantee was part and parcel of the rice sale.... While, in a narrow sense [the suit] might be said to be 'based upon' only the breach of the guarantee, the drafters of the FSIA intended no such niggardly construction." *Id.* Thus, in analyzing the commercial activity exception to the FSIA, courts have focused on the overall transaction as a whole rather than specific instances of ancillary government activity.

### 3. Direct Effect in the United States

Having concluded the foreign state defendants' conduct on which Tifa's cause of action rests is commercial activity, consideration must now be given as to whether the commercial activity bears a relationship to the cause of action and to the United States as provided for in any of the three clauses of § 1605(a)(2) of the FSIA. If such a relationship is established the exercise of subject matter jurisdiction is warranted. *See Velidor*, 653 F.2d at 819 (citing *Texas Trading*, 647 F.2d at 309).

The relevant provision is the third clause of § 1605(a)(2) of the FSIA which states:

A foreign state shall not be immune from the jurisdiction of courts of the United States or of the states in any case— ... in which the action is based ... upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

In *Texas Trading* the court explained the terms "direct effect" and "in the United States." After the court concluded Nigeria's actions were commercial activity, the issue was whether the breach of the contracts and the letters of credit caused a direct effect in the United States.

Construing the term "direct effect" the Second Circuit reasoned:

Applying the term [direct effect] to a corporation is not so simple. Unlike a natural person, a corporate entity is intangible; it cannot be burned or crushed. It can only suffer financial loss. Accordingly, the relevant inquiry under the direct effect clause when plaintiff is a corporation is whether the corporation has suffered a "direct" financial loss. To discover whether breach of a contract causes this type of loss, we look to *Carey v. National Oil Corp.*, 592 F.2d 673, 676–77 (2d Cir.1979) (*per curiam*). In *Carey* we decided that a direct effect can arise not only from a tort ... but from cancellation of a contract for the sale of oil as well. Here, under either theory of recovery, breach of the cement contracts

governmental function and thus the commercial activity exception to FSIA did not apply. 477 F.Supp. at 567. On appeal the Ninth Circuit declined to decide the question of subject matter jurisdiction but nonetheless noted if OPEC's activity was defined as making agreements to fix prices, it would be commercial activity and immunity would not apply. 649 F.2d at 1358.

The Ninth Circuit went on to base its affirmance of the district court on the act of state doctrine. *Id.* at 1358–62. Because the question of commercial activity was left open by the Ninth Circuit, the *OPEC* case does not provide clear guidance on the question of commercial activity in the case at bar.

or breach of the letters of credit, the effect of the suppliers was "direct." They were beneficiaries of the contracts that were breached.

*Id.* at 312 (citation omitted).

The Second Circuit found this direct effect had occurred "in the United States" for these reasons: "First, the cement suppliers were to present documents and collect money in the United States, and the breaches precluded their doing so. Second, each of the plaintiffs is an American corporation." *Id. See also Crimson Semiconductor, Inc. v. Electronum*, 629 F.Supp. 903, 907 (S.D.N.Y.1986) ("This case falls within § 1605(a)(2) because the breach had a 'direct effect' in the United States, namely, a financial loss suffered by the beneficiary of the contract, a New York corporation."). The *Texas Trading* court specifically left open the question of "[w]hether an American corporation injured overseas incurs a direct effect in the United States...." 647 F.2d at 312 n. 35.

■ In the case at bar, Tifa is an American corporation with its principal place of business in New Jersey. (Amended Complaint, Parties, ¶ 1.) Unlike the facts in *Texas Trading*, there is no allegation Tifa was to present documents or collect money in the United States. Apparently, Sunrise was to have been paid by the SSB after presenting the government contracts in Ghana. (Amended Complaint, First Count. ¶ 23.) It appears Sunrise would then pay Tifa. Although Tifa apparently was not to be paid by the governmental defendants in the United States, the goods and equipment were allegedly assembled in New Jersey and shipped to Ghana. (Livingston Cert. ¶ 14.) The SSB also forwarded two accepted drafts to Tifa's bank in New York City. There has been obvious financial loss to Tifa as a result of not being paid for the goods. Based on these effects in the United States, the foreign state defendants' alleged acts had a direct effect in the Unit-

ed States. Thus, the third clause of subsection 1605(a)(2) is satisfied.

The Second Circuit has reasoned "Courts construing [the terms "direct effect in the United States"] should be mindful more of Congress's concern with providing 'access to the courts' to those aggrieved by the commercial acts of a foreign sovereign than with [the case law interpreting direct effect.] The question is was the effect sufficiently 'in the United States' that Congress would have wanted an American court to hear the case? No rigid parsing of § 1605(a)(2) should lose sight of that purpose." *Texas Trading*, 647 F.2d at 313. Based on this analysis, I am satisfied Congress intended this type of an action to be brought in American courts. This court has subject matter jurisdiction over this action as it relates to the foreign state defendants. Accordingly, the governmental defendants' motion to dismiss this action for lack of subject matter jurisdiction is denied.[7]

The governmental defendants argue the third clause of § 1605(a)(2) is not applicable to the case at bar. They rely on the following language from *Magnus Electronics, Inc. v. Royal Bank of Canada*, 620 F.Supp. 387 (N.D.Ill.1985):

> As for "direct effect," Magnus seeks to read that requirement as though mere economic impact on a United States party, caused by a foreign government's actions on its own soil, were enough to subject the foreign sovereign to suit here. That construction of course would prove too much: It would eliminate sovereign immunity altogether, for all the United States plaintiff would have to show would be *damages* caused by the alleged wrongful conduct of the foreign government in its own territory. Due process constraints preclude such a broad sweep against *private* litigants and it would be anomalous indeed if a foreign nation could be haled into court here on so slender a connection when a non-sovereign could not.

7. As previously noted, any issue as to subject matter jurisdiction over the claims relating to the Embassy or Baah–Boakye (*see* Amended Complaint, Ninth Count) can best be resolved by the transferee court in the District of Columbia following appropriate discovery and additional briefing.

*Magnus,* 620 F.Supp. at 390 (citation omitted). (*See* DM at 12; Defendants' Reply Memorandum at pp. 8–9.)

*Magnus* involved an agreement between an American seller and a private Argentinean buyer. *Id.* at 390. Argentina became involved in the transaction only by intercepting the goods before they reached the buyer. The court held this was not commercial activity and there was no direct effect in the United States. *Id.*

The *Magnus* court seems to overlap the inquiry of subject matter jurisdiction under the FSIA with that of personal jurisdiction. The question of subject matter jurisdiction under the FSIA does not involve a due process consideration of minimum contacts. Rather, the question of a personal jurisdiction involves a consideration of whether the defendants have sufficient contacts with the United States such that jurisdiction can be exercised consistent with due process. *See Texas Trading,* 647 F.2d at 313.

Thus *Magnus* is factually distinct from the case at bar because Ghana did not engage in any activity analogous to Argentina's seizure of the goods. Moreover, the due process concerns expressed by the *Magnus* court are not relevant to an analysis of subject matter jurisdiction. Rather, these due process concerns are relevant to the issue of personal jurisdiction. These concerns can be addressed if and when the personal jurisdiction question is considered by the transferee court.

Defendants also argue that the sixth through ninth counts are barred by § 1605(a)(5)(B) of the FSIA because they are expressly precluded by its provision barring claims arising out of misrepresentation, deceit or interference with contract rights.[8] (DM at 7.)[9]

■ Section 1605(a)(5), like section 1605(a)(2) (the commercial activity exception), sets forth a general exception to the sovereign immunity of a foreign state. Section 1605(a)(5) provides an exception to sovereign immunity for the tortious activity of a foreign state. Subsection (B) of section 1605(a)(5), which the governmental defendants rely on, provides that section 1605(a)(5) does not apply, *inter alia,* to claims of misrepresentation, deceit or interference with contract rights.

Section 1605(a)(5) was intended to cover non-commercial torts which were not covered by section (a)(2). House Report at 6619–20; *Yessenin–Volpin v. Novosti Press Agency,* 443 F.Supp. 849, 855 (S.D.N.Y. 1978). The legislative history also reveals section (a)(5) was directed primarily at the problem of traffic accidents. House Report at 6619. Thus, subsection (a)(5)(B) was not intended to restrict the scope of the commercial activity exception embodied in section 1605(a)(5). *United Euram v. U.S.S.R.,* 461 F.Supp. 609, 612 (S.D.N.Y. 1978). The language of section 1605(a)(5) specifically states it applies only to cases "not otherwise encompassed in paragraph (2) above [the commercial activity exception]."

Section 1605(a)(5) of the FSIA does not apply to cases such as this which involve commercial activity encompassed in section 1605(a)(2). Because section 1605(a)(5) is not applicable to the case at bar, subsection (B) which is part of section 1605(a)(5) cannot be applicable to this case. As previously discussed, the ninth count involving claims against the Embassy and Baah-

---

**8.** 28 U.S.C. § 1605(a)(5) provides, in relevant part:

A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

\* \* \* \* \* \*

(5) not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to—

\* \* \* \* \* \*

(B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

**9.** Defendants characterize the seventh count which seeks recovery under the doctrine of quantum meruit or quasi-contract as stating a cause of action for interference with contract rights. (DM at 7.)

Boakye does not appear to be governed by the FSIA. Thus, the sixth through ninth counts are not barred by section 1605(a)(5)(B).

### B. Venue and Transfer

Although the issue of personal jurisdiction is normally decided prior to questions of venue, the court may reverse the normal order when there is "a sound prudential justification for doing so." *Leroy*, 443 U.S. at 180, 99 S.Ct. at 2715. Because it appears additional discovery will be required as to the issue of personal jurisdiction, I shall address the question of venue prior to the question of personal jurisdiction.

The governmental defendants argue the venue of this action in the District of New Jersey is improper under the venue provision of the FSIA. 28 U.S.C. § 1391(f). They assert the proper venue for this action lies in the United States District Court for the District of Columbia.

The venue provision of the FSIA provides in relevant part:

A civil action against a foreign state as defined in section 1603(a) of this title may be brought—

(1) in any judicial district *in which a substantial part of the events or omissions giving rise to the claim occurred*, or a substantial part of property that is the subject of the action is situated;

\* \* \* \* \* \*

(4) in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof.

28 U.S.C. § 1391(f) (emphasis added).

Subsection one requires "a substantial part ... of the events or omissions giving rise to the claim" to occur in a judicial district in order for venue to be proper in that district. Courts have required extensive events or omissions giving rise to a claim to occur in the forum in order for venue to be appropriate under the FSIA venue provision. *See Schmidt v. Polish People's Republic*, 579 F.Supp. 23, 28 (S.D. N.Y.), *aff'd*, 742 F.2d 67 (2d Cir.1984) (in action against Polish government on defaulted treasury notes the fact that (1) the original loan, (2) negotiations after a default, (3) execution of an agreement and (4) payment of notes, all took place in the Southern District of New York made venue proper in that district under § 1391(f)(1)); *Translinear, Inc. v. Republic of Haiti*, 538 F.Supp. 141, 144–45 (D.D.C.1982) (in contract action against Haiti the following facts made venue in the Northern District of Texas proper under the FSIA: (1) the plaintiff's offices were in the district, (2) some of the development services, which plaintiff claimed it was entitled to payment for, were performed through the plaintiff's offices in the district, (3) the offices of one of plaintiff's subcontractors were located in the district; and (4) Haitian officials met with representatives of the plaintiff and its subcontractor in the district).

■ The presence of a corporate headquarters alone in the judicial district does not render venue in that district proper. *See Falcoal Inc. v. Turkiye Komur Isletmeleri Kurumu*, 660 F.Supp. 1536 (S.D. Tex.1987) (even though plaintiff has headquarters in Texas, venue in Texas would be inappropriate under the FSIA because the defendant lacked contacts with Texas).

■ Tifa alleges the following occurred in New Jersey: (1) Tifa is a New Jersey corporation with its principal place of business in Millington, N.J. (Amended Complaint, Parties, ¶ 1); (2) around December, 1976 the initial proposal identifying the goods, equipment and training necessary to conduct the project was sent from New Jersey to General Acheampong, the Head of State of Ghana (Livingston Cert. ¶ 4.); (3) on March 10, 1977, Howard, Ozdor and Akatto met with Livingston at Tifa's office in Sterling, New Jersey. (Amended Complaint, First Count. ¶ 4.) Livingston asserts Howard, Ozdor and Akatto advised him at the meeting that General Acheampong was impressed with the proposal for the spraying project and had no objection to the funding arrangement (*Id.*); (4) in April, 1977, Colonel Akompi of the SMC sent a letter to Tifa in New Jersey to confirm the success of discussions between

Livingston and Ghanaian officials (Livingston Cert., ex. 4); (5) in July, 1978 Colonel Akompi sent a letter to Tifa in New Jersey informing Livingston that the import license was issued and requesting that Tifa "send the items as a matter of urgency." [10] (Livingston Cert., ex. 9); and (6) goods and equipment were assembled in New Jersey and shipped from New Jersey to Ghana. (Livingston Cert., ¶ 14.)

Taken together, the above events which occurred in New Jersey cannot be considered a substantial part of the events giving rise to this claim. Most of the events which occurred in New Jersey did not give rise to this claim. The presence of Tifa's headquarters in New Jersey did not give rise to this claim and does not render venue in New Jersey proper. *See Falcoal*, 660 F.Supp. 1536. The mailing of the original proposal was merely a preliminary negotiation. The single meeting in New Jersey also appears to be a preliminary discussion and Tifa does not allege reliance on the meeting. The April, 1977 letter sent by Akompi to New Jersey merely confirmed the discussions were proceeding successfully.

Tifa does allege reliance on the July, 1978 letter from Akompi concerning issuance of the import license and requesting Tifa to send the items as a matter of urgency. Also the shipment of the goods from New Jersey could be said to give rise to this claim. Nonetheless, these two events are not a substantial part of the events which gave rise to this action. More extensive events giving rise to the claim would be required in New Jersey in order for New Jersey to be the proper venue. *See Schmidt*, 579 F.Supp. at 28; *Translinear*, 538 F.Supp. at 144–45.

The significant events and omissions giving rise to this claim all took place outside of New Jersey. The December, 1976 meeting between Livingston, Howard, Ozdor, and Akatto which spawned the proposal for the project by Tifa took place in New York

City. (Amended Complaint, First Count, ¶ 1.) The meetings with the Ghanaian officials, which Tifa allegedly relied on in entering into the agreement with Sunrise, took place in Ghana. (*See* Amended Complaint, First Count, ¶¶ 7–8, 22.) The special treatment of Tifa's shipments to Ghana was allegedly granted by the government or its ministries in Ghana. (Amended Complaint, Second Count, ¶ 2.) The accepted drafts which Tifa places emphasis on were sent to Tifa's bank in New York City. (Livingston Cert., Ex. 10.) The Ghanaian governmental subdivisions which Tifa names in this action all acted in Ghana. (*See* Sixth Count—Eighth Count.) The non-governmental defendants which Tifa seeks to sue personally all acted in Ghana. (*See* Amended Complaint, Parties; Third Count—Eighth Count, Tenth Count.)

Because a substantial part of the acts or omissions which give rise to this action did not occur in New Jersey, venue of this action is not proper in New Jersey under § 1391(f)(1) of the FSIA. The proper venue for this action is the United States District Court for the District of Columbia under § 1391(f)(4). This is an action primarily against a foreign state and political subdivisions of a foreign state based upon significant and substantial events and omissions which occurred outside of New Jersey. Therefore, venue is proper in the District of Columbia under § 1391(f)(4) of the FSIA.

When a case is filed laying venue in the wrong judicial district, the district court in which the case was improperly filed may "in the interest of justice transfer such case to any district ... in which it could have been brought." 28 U.S.C. § 1406(a). Because venue is improper in the District of New Jersey, this action will be transferred to the United States District Court for the District of Columbia. Under § 1391(f)(4) of the FSIA this action could have been brought originally in the District of Columbia. Therefore, transfer is proper under § 1406(a).

---

10. Tifa does not allege reliance on this letter in the complaint. However, in the Livingston Certification Tifa alleges it relied on this letter and "other various communications from government officials in Ghana" when it shipped the goods to Ghana in September and December, 1978. (Livingston Cert., ¶ 14.)

Tifa contends this case should not be transferred to the District of Columbia because § 1391(f) applies only to foreign states or political subdivisions thereof and not to agencies or instrumentalities of the foreign state. (PM at 39.) Tifa contends venue in the District of Columbia may not be proper for those governmental entities which are not agencies or instrumentalities of Ghana, specifically the GCMB. Section 1391(f) applies to an action brought against a "foreign state as defined in section 1603(a)." Section 1603(a) in turn provides that a foreign state "includes a political subdivision of a foreign state or *an agency or instrumentality of a foreign state* as defined in subsection (b)" (emphasis added). Subsection 1603(b) in turn provides:

An "agency or instrumentality of a foreign state" means any entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States ... nor created under the laws of any third country.

The GCMB is an agency of a cabinet level department of the Government of Ghana. (Otoo Aff., ¶ 7.) The GCMB is not a citizen of a state of the United States nor is it created under the laws of any third country. (*Id.*) Thus, the GCMB is a foreign state for the purposes of the FSIA.

Because venue is improper in the District of New Jersey and additional discovery has been requested, I decline to consider the governmental defendants' alternative grounds for dismissal on the basis of lack of personal jurisdiction or forum non conveniens. The portion of the motion to dismiss on the grounds of diplomatic immunity has not been adequately briefed and additional discovery may also be required on this aspect of the motion. (*See* PM at 41–42.) Because additional discovery and submissions may be required to resolve the questions of personal jurisdiction, forum non conveniens and diplomatic immunity, these issues can best be dealt with by the transferee court in the District of Columbia.

*Conclusion*

For the foregoing reasons the governmental defendants' motion to dismiss for lack of subject matter jurisdiction is denied. The governmental defendants' motion to transfer this action for improper venue is granted; this case is transferred to the United States District Court for the District of Columbia.